James Carl HIGGS, et al.,
Plaintiffs–Appellants,

v.

David H. BLAND, et al.,
Defendants–Appellees.

Nos. 88–5348, 88–5352.

United States Court of Appeals,
Sixth Circuit.

Argued April 21, 1989.

Decided Oct. 27, 1989.

James Carl Higgs, Eddyville, Ky., pro se.

Elmer Deaton, et al, pro se.

Thomas J. Banaszynski, Oliver H. Barber, Jr., Gittleman, Bleidt & Barber, Joseph S. Elder, II, argued, Robert A. Lee, Louisville, Ky., for plaintiffs-appellants.

Thomas B. Ray, pro se.

Barbara W. Jones, Glenda Hardison, Office of the Atty. Gen. of Kentucky, Frankfort, Ky., Joseph M. Whittle, U.S. Atty., Hancy Jones, III, Asst. U.S. Atty., Office of the U.S. Atty., Louisville, Ky., Mitchell Dale, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., Connie V. Malone argued, Office of General Counsel, Frankfort, Ky., Linda G. Cooper, argued, Nashville, Tenn., for defendants-appellees.

Before KEITH, KENNEDY and RYAN, Circuit Judges.

KEITH, Circuit Judge.

In this consolidated action, plaintiffs, two classes of prisoners incarcerated at the Kentucky State Penitentiary ("KSP") and the Kentucky State Reformatory ("KSR") appeal from the denial of their motion to alter or amend the order of the district court denying a preliminary injunction enjoining defendants, various Kentucky Department of Corrections officials, from taking disciplinary action against prisoners based on urinalysis tests for drugs. Plaintiffs also appeal the denial of their motion to alter or amend the order of the district court denying an award of attorney's fees pursuant to 42 U.S.C. § 1988 and the provisions of an Agreed Order entered in conjunction with a consent decree entered in a previous action. *Kendrick v. Bland*, 541 F.Supp. 21 (W.D.Ky.1981). For the reasons which follow, we affirm the judgment below inasmuch as it denied the injunction and declined to award fees under § 1988,

vacate the denial of fees under the consent decree, and remand.

## I.

### A.

Since approximately 1981, the Kentucky Department of Corrections has administered urinalysis tests to prisoners in the Kentucky State Reformatory and the Kentucky State Penitentiary. The specific test used by the State of Kentucky was the Syva EMIT drug detection system. Under the state procedure, when test results indicated the presence of drugs in an inmate's system, the inmate was charged with being "under the influence of drugs or intoxicants." In such cases, only the positive test results were used as evidence to support the inmate's conviction. An inmate, if found guilty, was subject to as much as 45 days in disciplinary segregation and loss of 60 days good time credits.

Experts appearing in this matter have testified that the Syva EMIT is a useful tool in the detection of drug presence in the body of the person tested.

The procedure for the gathering of urine samples was adequately summarized by the counsel for the plaintiffs in the proposed findings of fact beginning at page 2:

The urinalysis testing procedure is relatively simple. A urine sample is taken in the presence of medical and security personnel at the Penitentiary and by security personnel at the Reformatory. The samples are collected by having an inmate urinate into a bottle. These bottles are then sealed in the presence of the inmate, placed in a box which is later sealed, placed in a locked refrigerator in the institution's laboratory or hospital, and subsequently transported to Luther Luckett Correctional Complex for testing by Issa Pirouznia.

Each time the sample comes into the custody and possession of a different individual, a chain of custody form is to be completed. This is to be completed from the taking of the sample until the test results are returned to the institution of origin. The chain of custody is an attempt to protect the integrity of the sample; however, there was ample testimony from inmates as to violations of the chain of custody on paper and in practice.

All samples are tested by Issa Pirouznia, the Corrections Laboratory Technician, at the Luther Luckett Correctional Complex. Mr. Pirouznia testified that he followed accepted laboratory procedures to insure that the test results were accurate. This included cleaning of the machinery, testing vials and other equipment. He also noted that he periodically calibrated the machinery using controlled mediums furnished by the SYVA Company, and in addition would use a method kown (sic.) as a "blank" in an effort to eliminate any false positives. False positives are readings which show a positive presence of a particular drug, when in fact that drug is not present.

Each sample which arrives at the laboratory at Luther Luckett is tested. When a test is positive, the Lab Technician runs a second test on that sample, again using the SYVA Emit System in an effort to insure the test accuracy. At the conclusion of the testing procedures, the Laboratory Technician reviews his test results and indicates with a P (for positive) or an N (for negative) the presence or absence of a particular substance on a summary sheet for the totality of the samples tested in a particular run. These Ns and Ps are then again transferred to the chain of custody form.

The results of the test are returned to the institution where the test subject is a resident. A test result returned positive for a controlled substance will result in disciplinary action.[1] The positive notation by Mr. Pirouznia is usually the only evidence presented at the adjustment committee hearing in support of the charge in the write-up. Requests by inmates to have Mr. Pirouznia present as a witness at the hearings or to have him respond to written

---

1. The inmate was formally charged with being under the influence of the particular drug but is now charged with the unauthorized use of the drug.

interrogatories in lieu of an appearance have been repeatedly denied by the Adjustment Committee.

## B.

The first action, No. 85–5701, was brought as a motion for contempt under the *consent decree* entered in *Kendrick v. Bland*, 541 F.Supp. 21 (W.D.Ky.1981), and was subsequently consolidated with actions brought by other prisoners. The plaintiffs requested that the district court enjoin defendants from using the Syva EMIT test to punish inmates for the use of drugs. The District Court for the Western District of Kentucky, Judge Johnstone presiding, granted the request and enjoined the defendants from taking any disciplinary action against plaintiffs based solely upon unconfirmed results of Syva EMIT drug detection tests. He further ordered that if these results were offered as evidence in a disciplinary hearing, the defendants were to implement procedures in administering the Syva EMIT drug detection tests which maintain the integrity of the urine sample.

The second action, *Brown v. Wilson, et al.*, No. 85–5887, was brought by another state prisoner who had been found by a disciplinary board to be "under the influence of drugs or intoxicants" on five different occasions while confined as a state prisoner. These convictions were based solely on Syva EMIT test results. Among other things, plaintiff requested injunctive and declaratory orders restraining defendants from taking disciplinary action based solely upon the Syva EMIT test. The District Court for the Western District of Kentucky, Chief Judge Allen presiding, issued the requested preliminary injunction adopting Judge Johnstone's holding in Case No. 85–5701.

On January 3, 1984, this case was consolidated with *Kendrick v. Bland* Civil Action No. 76–0079–P(J) consolidated with *Thompson v. Bland*, Civil Action No. 79–0092–O(J) "for the sole purpose of a hearing on the plaintiffs' constitutional challenge of defendants policy utilizing urinalysis testing to determine drug use within the institution." The magistrate conducted a hearing and recommended that a preliminary injunction be entered. The district court followed the magistrate's recommendation and entered an order granting the plaintiffs' motion for a preliminary injunction. On appeal to the Sixth Circuit, 793 F.2d 1291, the court vacated the injunction as being "improvidently granted" because of insufficient findings and due to the district court's failure to specify whether the injunction was issued under the *consent decree* entered in *Kendrick v. Bland*, 541 F.Supp. 21 (W.D.Ky.1981) or under due process. On remand, the magistrate held an additional hearing and subsequently recommended that the injunction be denied. The magistrate found that the issue of urinalysis did not fall within the *consent decree;* the utilization of urinalysis testing did not violate the inmates' due process rights; the use of the P & N sheet and disciplinary hearing without the actual test tape did not violate due process; and that lab technician was not the "accuser" so as to require him to be at the inmates' disciplinary hearings for cross examination. This court entered an order whereby it accepted the findings and recommendation of the magistrate. The defendants filed a motion to alter or amend regarding the issue of attorney's fees and both sides filed objections to the magistrate's report. On November 13, 1987, the court entered an order vacating the order of September 2, 1987 regarding the awarding of attorney's fees. The plaintiffs then filed a motion to alter or amend concerning the substantive issues regarding urinalysis testing and the issue of attorney's fees. The district court denied this motion, holding as follows:

First, the plaintiffs argue that the due process requirement of the Fourteenth Amendment is not the same as the due process requirements of the *consent decree* and that the court has failed to distinguish between the two. The plaintiffs have misconstrued the court's opinion. In its memorandum opinion entered November 13, 1987, the court held that the urinalysis results as transposed onto the P & N sheets was sufficient to satisfy the "some evidence" requirement under *Superintendent, Mass. Corr. Insti-*

*tution, Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The court did not analyze this issue under the *consent decree* because neither the court nor the magistrate ever found that this issue was covered under the *consent decree.* To the extent that this issue has not been clarified, the court will attempt to do so now. In reviewing the *consent decree,* the court fails to find nor has it been referred to any provision of the decree which covers the issue of urinalysis testing. Accordingly, the only issue is whether the testing violates the due process rights of the plaintiffs under the Fourteenth Amendment, which it does not.

Secondly, the plaintiffs argue that they are entitled to attorney's fees under 42 U.S.C. § 1988 "for so much of the relief obtained that relates to the fact that the Defendants have implemented procedures in the urinalysis testing program to insure the integrity of the urine sample." A party does not have to prevail on every issue to be a prevailing party. *See e.g. North Cross v. Board of Education of Memphis City Schools,* 611 F.2d 624 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). However, in order to determine who is a prevailing party, an examination of the claim must be conducted to determine if the substantive relief sought by the plaintiffs was achieved. *Kentucky Association for Retarded Citizens v. Conn,* 718 F.2d 182 (6th Cir.1983). The crux of the litigation centered around the plaintiffs' assertions that urinalysis testing should not be conducted because the test was unreliable and violated the plaintiffs' due process rights. The plaintiffs sought an injunction preventing urinalysis testing which this court has denied. Accordingly, the plaintiffs have not prevailed on the substantive issue. Neither is the court convinced that the procedures implemented by the defendants to insure the integrity of the urine samples were a result of this litigation. Accordingly, the plaintiffs are not entitled to attorney's fees under 42 U.S.C. § 1988.

Finally, the plaintiffs argue that they are entitled to attorney's fees under the *consent decree.* This case, *Higgs v. Wilson* (C83–0256–P(J), was consolidated with *Kendrick v. Bland,* Civil Action No. 76–0079 and *Thompson v. Bland,* Civil Action No. 97–0092, on January 5, 1984, for the purpose of a hearing on:

a. Coercive means of obtaining the urine sample;

b. Means of selecting those inmates to be submitted for the testing;

c. Marginal inaccuracy, if any, inherent in the test;

d. Unsubstantiated chain of custody of the urine sample from the time it is taken from the inmate to its analysis at LLC until the ultimate finding as documented in the report as given to the tested inmate;

e. Use of the uncorroborated test results as the sole basis for an institutional disciplinary write-up and disciplinary proceeding before the institution's adjustment committee; and

f. Refusal of the defendants to afford the inmates the right to call the diagnosing lab technician, other experts, or lay witnesses to testify at their disciplinary proceeding in opposition to the test report.

On April 19, 1984, the court entered an Agreed Order in the *Kendrick* and *Thompson* case which allowed for the payment of attorney's fees. The order stated that "[t]hese fees shall be paid for all work done in this case unless this Court finds that the matters litigated are frivolous and totally unfounded." In the present case the only issue which arguably falls within the *consent decree* is the issue of whether the inmates may call the lab technician and cross-examine him concerning the lab results. This is only a miniscule part of the litigation conducted in this case. The focus of this case centered on whether urinalysis testing was proper. This has no relationship to the *consent decree.* Accordingly, the court finds that the issue of cross-examination of the lab technician is such a small element of this litigation that an

award of attorney's fees under the *consent* decree would be improper and unjust.
Memorandum Opinion of February 18, 1988 at 3–5.

It is this order from which plaintiffs appeal.

## II.

This case comes to this court on review of a denial of a preliminary injunction. In determining whether a preliminary injunction should be granted, a district court must consider:

1. Whether the plaintiffs have shown a strong likelihood of success on the merits;

2. Whether the plaintiffs have shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest is served or harmed by issuance of the injunction.

*USACO Coal Company v. Carbomin Energy, Inc.,* 689 F.2d 94, 98 (6th Cir.1982). "The granting or denial of a preliminary injunction is committed to the sound discretion of the trial court," *id.;* thus, "our review of these four issues is limited to whether the district court abused its discretion in granting the preliminary injunction." *Id.*

### A.

#### Fourteenth Amendment

■ The evaluation of claims by prisoners that a prison disciplinary proceeding has denied them due process is governed by the Supreme Court's analysis in *Superintendent, Massachusetts Correctional Institution at Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). In *Hill,* two inmates received disciplinary notices charging each with the assault of another inmate. At separate hearings, a corrections officer gave testimony and presented a written report stating that, after hearing an inmate call out, the officer found an inmate in a walkway who bore the marks of an assault. After seeing

three inmates jogging away down the walkway, including the two petitioners in *Hill,* he concluded that they had assaulted the inmate. The petitioners denied their guilt at the hearing, and the victim gave a statement exonerating them. Regardless, the disciplinary board found the two inmates guilty and recommended that both lose one hundred days of good time credits and be placed in isolation for fifteen days. This punishment was affirmed by the superintendent.

In a subsequent lawsuit in state court, the two inmates argued that the disciplinary board's action violated their constitutional rights because "there was no evidence to confirm that the incident took place nor was there any evidence to state that if the incident did take place the [two inmates] were involved." 472 U.S. at 448, 105 S.Ct. at 2770. The state court concluded that "The Board's finding of guilty rested, in each case, on no evidence constitutionally adequate to support that finding," *id.,* and granted summary judgment for the inmates. The Supreme Judicial Court of Massachusetts affirmed that judgment. The Supreme Court reversed:

We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." (citation omitted). Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. (citations omitted). We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances.

472 U.S. at 455–56, 105 S.Ct. at 2774. The question, therefore, is whether the EMIT test results constitute "some evidence" under *Hill.*

■ The reliability of the EMIT test has repeatedly been found to meet due process standards. *See Spence v. Farrier,* 807 F.2d 753, 756 (8th Cir.1986), and cases cited therein. Although plaintiffs introduced evidence that indicated some lapses in the chain-of-custody, "the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible 'property' or 'liberty' interest be so comprehensive as to preclude any possibility of error." *Mackey v. Montrym,* 443 U.S. 1, 13, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321 (1979) (upholding a statute mandating suspension of a driver's license for refusal to take a breath-analysis test). "The Due Process Clause simply does not mandate that all governmental decision making comply with standards that assure perfect, error-free determinations." *Id.*

Of course, a test which produced frequent incorrect results could fail to constitute "some evidence" under the *Hill* standard. However, no evidence was produced in this case to indicate that the probability of false results was more than a mathematical possibility. In evaluating the possibility of false positives, it should be kept in mind that "[t]he specific dictates of due process must be shaped by 'the risk of error inherent in the truth finding process as applied to the generality of cases' rather than the rare exceptions." *Montrym,* 443 U.S. at 14, 99 S.Ct. at 2619 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976)).

Based on these concerns, we have little difficulty in concluding that the presence of a positive EMIT test constitutes "some evidence" from which the adjustment board could conclude that a tested inmate was guilty of the offense of drug use.

## B.

### The Consent Decree

■ Section 5 of the consent decree provides that prisoners accused of disciplinary infractions shall have "an opportunity to confront and cross-examine his accuser and all adverse witnesses, unless doing so would be unduly hazardous to institutional security." Plaintiffs argue that this language requires that the adjustment committee grant the requests of accused inmates to have the laboratory technician who ran the EMIT test testify at the inmate's hearing.

We agree with the views of the magistrate, adopted by the district court, in rejecting this argument:

The defendants argue that the laboratory technician is not the inmate subject's accuser or adverse witness. Understanding the above procedure for the gathering and analyzing of urine samples demonstrates that this is so. Mr. Pirouznia's sole function is to conduct the EMIT procedure on the urine samples submitted to him by the officials of the penal institutions. He is not in the position to accuse any inmate subject of any offense because, in the case of the EMIT samplings, he is not in the presence of the inmate when the controlled substance is allegedly possessed or ingested. Likewise, he is not an adverse witness. He has no testimony based upon personal knowledge which would implicate the inmate subject of the charges contained in the incident report. The laboratory technician only receives the samples, conducts the testing procedures, and reports the results of those procedures. As stated by the defendants' counsel, Mr. Pirouznia "is merely the conduit by which the test is performed." The failure of the defendants to call the laboratory technician does not violate the cited portion of the Consent Decree and it does not appear that either the Consent Decree or *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), requires the production of a witness to testify at an adjustment committee hearing who has no personal knowledge of the historical facts or circumstances surrounding the charges alleged in the write-up.

Magistrate's Report of September 22, 1987 at 9–10.

## III.

### A.

*Attorney's Fees under 42 U.S.C. § 1988*

■ As a general matter under § 1988, prevailing parties in civil rights litigation brought pursuant to certain civil rights legislation may recover reasonable attorney's fees. This court had previously defined "prevailing party" as one who prevails on the "central issue." *Kentucky Association For Retarded Citizens, Inc. v. Conn,* 718 F.2d 182, 186–7 (1983). However, after this case was briefed, but before argument, the Supreme Court decided *Texas State Teachers Association v. Garland Independent School District,* —— U.S. ——, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), in which the court rejected the "central issue" test in favor of the following:

> If the plaintiff has succeeded on "any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit" the plaintiff has crossed the threshold to a fee award of some kind. The floor in this regard is provided by our decision in *Hewitt v. Helms,* 482 U.S. 755 [107 S.Ct. 2672, 96 L.Ed.2d 654] (1987). As we noted there, "[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." *Id.,* at 760 [107 S.Ct. at 2675]. Thus, at a minimum, to be considered a prevailing party within the meaning of § 1988 the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant. *Id.,* at 760–761 [107 S.Ct. at 2675–2676]; *Rhodes v. Stewart,* [—— U.S. ——] 109 S.Ct. 202 [102 L.Ed.2d 1] (1988).

—— U.S. at ——, 109 S.Ct. at 1493, 103 L.Ed.2d at 877. (citations omitted).

However, the Supreme Court went on to say that:

> Beyond this absolute limitation, a technical victory may be so insignificant, and may be so near the situations addressed in *Hewitt* and *Rhodes,* as to be insufficient to support prevailing party status. For example, in the context of this litigation, the District Court found that the requirement that nonschool hour meetings be conducted only with prior approval from the local school principal was unconstitutionally vague. App. to Pet for Cert. 58a. The District Court characterized this issue as "of minor significance" and noted that there was "no evidence that the plaintiffs were ever refused permission to use school premises during non-school hours." *Id.,* at 60a, n. 26. If this had been petitioners' only success in the litigation, we think it clear that this alone would not have rendered them "prevailing parties" within the meaning of § 1988. Where the plaintiff's success on a legal claim can be characterized as purely technical or *de minimis,* a district court would be justified in concluding that even the "generous formulation" we adopt today has not been satisfied. The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.

*Id.* (citations omitted). Thus, the crucial question remains: What was plaintiff's success, and was it de minimis?

The sum of plaintiff's "relief" is found in the district court opinion denying the injunction; it concerns the testing procedure:

> The defendants object to that part of the magistrate's report which suggests that the actual tapes of the urine tests should be provided along with the P & N sheet. Under *Hill* and the facts presented in this case, the P & N sheet is sufficient and meets the level of "some evidence." Therefore, disciplinary actions based on the production of the P & N sheet alone do not violate due process. However, the court can visualize situations where the P & N sheet would be inadequate, even under the *Hill* standard, and would violate due process. Accordingly, while not holding that the defendants must produce the actual test tapes along with the P & N sheet, the

court notes that such would be helpful and might avoid problems in the future.

The defendants also object to that part of the magistrate's report which states that the defendants, should "to the extent that they have not already done so, adopt procedures to assure the integrity of the samples from the time that they are taken until tested." The court agrees with this statement. In its memorandum opinion entered June 27, 1985, the court stated that the corrections procedure was adequate in theory; however, the court noted that evidence was presented which indicated that these procedures are not always followed. The court cautions the defendants that the integrity of the urine samples must be maintained.

We are not convinced that the "relief" here meets even the "generous formulation" announced in *Texas State Teachers Ass'n.* The tests continue; the lab technician is still not called as a witness. Indeed, production of the test tapes is not even an order, but is a mere suggestion; moreover, the "caution" that the integrity of urine samples must be maintained does not mean that the court ordered that the magistrate's report section dealing with this be incorporated into an order. In sum, plaintiffs did not win any alteration of their legal relationship with defendants. We, therefore, conclude that the points on which plaintiffs prevailed, if any, were *de minimis* under *Texas State Teachers Ass'n.* Therefore, denial of attorney's fees under § 1988 was appropriate.

### B.

#### Attorney's fees under the consent decree

■ As noted in Section IB, *supra,* the district court denied attorney's fees under the Agreed Order in *Kendrick* setting the standard for the award of fees under the consent decree:

**2.** We do not intend to suggest that plaintiffs are entitled to attorney's fees for the entire litigation. Just as the Agreed Order is clear that fees are to be denied only for frivolous and totally

On April 19, 1984, the court entered an Agreed Order in the *Kendrick* and *Thompson* case which allowed for the payment of attorney's fees. The order stated that "[t]hese fees shall be paid for all work done in this case unless this Court finds that the matters litigated are frivolous and totally ungrounded." In the present case the only issue which arguably falls within the *consent decree* is the issue of whether the inmates may call the lab technician and cross-examine him concerning the lab results. This is only a miniscule part of the litigation conducted in this case. The focus of this case centered on whether urinalysis testing was proper. This has no relationship to the *consent decree.* Accordingly, the court finds that the issue of cross-examination of the lab technician is such a small element of this litigation that an award of attorney's fees under the *consent decree* would be improper and unjust.

Memorandum Opinion of February 8, 1988 at 5.

The problem with the district court's reasoning is that the Agreed Order does not require that the work associated with the consent decree be a substantial part of the litigation. Instead, the Agreed Order is quite clear that "fees shall be paid for all work done in this case unless [the district court] finds that the matters litigated are frivolous and totally ungrounded." Nothing in any order of the district court suggests that the consent decree portion of this litigation was "frivolous and totally ungrounded." Therefore, we vacate that portion of the district court's order denying attorney's fees under the consent decree.[2]

### IV.

Accordingly, for the foregoing reasons, we affirm the denial of a preliminary injunction and the motion for attorney's fees under § 1988. The order denying attor-

ungrounded litigation, it is also clear that the Agreed Order, in referring to "work done *in this case (Kendrick),*" approves fees only to the extent the litigation is under the *consent decree.*

ney's fees under the Agreed Order is vacated and remanded for further proceedings.