RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0019p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

DAVID C. EATON,

                       *Plaintiff-Appellant,*

    *v.*

LEXINGTON-FAYETTE URBAN COUNTY
GOVERNMENT; JIM NEWBERRY, Mayor of the
Lexington-Fayette Urban County Government;
MARY HESTER, Assistant Director, Program and
Services, Division of Community Corrections,
Lexington-Fayette Urban County Government,

                       *Defendants-Appellees.*

No. 15-5732

> Appeal from the United States District Court
> for the Eastern District of Kentucky at Lexington.
> No. 5:07-cv-00215—Joseph M. Hood, District Judge.

Decided and Filed: January 28, 2016

Before: NORRIS, BATCHELDER, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Geraldine Kay Hine, Lexington, Kentucky, for Appellant. Carolyn C. Zerga, LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT, Lexington, Kentucky, for Appellees.

_____

**OPINION**

_____

    SUTTON, Circuit Judge. David Eaton sued a municipality, claiming that its drug-testing program was so unreliable that it violated his Fourth (and Fourteenth) Amendment rights.

Because Eaton did not offer sufficient evidence to support his claim, the district court granted the municipality's motion for summary judgment.  We affirm.

In August 2005, Eaton asked a family court in Lexington, Kentucky, to grant him custody of his infant son.  He alleged that the child's mother would endanger the child's safety if she retained custody.  The mother did not leave it at that.  She responded that Eaton had "significant substance abuse issues" of his own.  R. 68-3 at 2.  In the face of these competing claims, the family court ordered both parents to undergo drug and alcohol testing at the Community Alternative Program, a program run by an arm of the Lexington municipal government.

The mother's results came back clean.  Eaton's did not.  He tested positive for cocaine and opiates.  The family court ordered him to undergo additional testing on a regular basis.  All told, between January 2006 and July 2007, Eaton took around 120 urine tests through the community program.  He tested positive for drugs at least ten times and for alcohol at least twenty times.

Soon after Eaton began the drug testing, he moved to strike some of the positive results, claiming they were inaccurate.  The family court denied the request, and Eaton did not appeal.  He nevertheless sought to avoid taking more tests through the community program, possibly because an alternative site was more convenient, possibly because he thought the alternative site would generate better results.  As to the latter possibility, any such hopes did not pan out.  On several occasions, Eaton gave a urine sample at both the community program and the alternative site on the same day.  At the alternative site, Eaton tested positive in four drug tests and one alcohol test.  So far as the record shows, the results at the two sites never came to opposite results.  Nevertheless, the family court in July 2007 granted Eaton's request to cease testing at the community program, allowing him to test exclusively at the alternative location.

A few months later, the family court granted sole custody of the child to the mother, apparently due to Eaton's ongoing substance abuse problems.

Meanwhile, Eaton filed a § 1983 action at roughly the same time that he stopped going to the community program for drug and alcohol testing.  He filed the federal action against the Lexington-Fayette Urban County Government (and two city officials) and alleged that each drug

test at the community program violated his Fourth Amendment rights. He argued that the community program "fail[ed] to use adequate procedures to allow for reasonable reliability of the test results." R. 1 at 2. He sought a declaration that the drug-testing policy was unconstitutional, an injunction against its continued implementation, and over $200,000 in damages.

The district court dismissed the claims for declaratory and injunctive relief because they interfered with the ongoing family court litigation. *See Younger v. Harris*, 401 U.S. 37 (1971). And it stayed the damages claims to give the state courts a first shot at assessing Eaton's Fourth Amendment challenge. *See Deakins v. Monaghan*, 484 U.S. 193 (1988).

The district court lifted the stay after the state courts declined to reach Eaton's constitutional claims. *See Eaton v. Johnson*, Nos. 2010-CA-002080-ME, 2011-CA-001907-ME, 2012 WL 3762034, at *1 (Ky. Ct. App. Aug. 31, 2012). The district court later granted Lexington's motion for summary judgment, holding that (1) his Fourth Amendment claims were defective and (2) his challenges to his earliest drug tests were time-barred. *Eaton v. Lexington-Fayette Urban Cty. Gov't*, No. 07-215-JMH, 2015 WL 3548816, at *3–4 (E.D. Ky. June 8, 2015). Eaton appeals both rulings. We need not address the statute-of-limitations ruling, as he did not present enough evidence to permit any of his Fourth Amendment claims, whether time-barred or not, to survive summary judgment.

"[S]tate-compelled collection and testing of urine," the Supreme Court has said, "constitutes a 'search' subject to the demands of the Fourth Amendment." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). The "touchstone" of validity in this area comes down to "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quotation omitted). That in turn requires "a fact-specific balancing of the intrusion on the [subject]'s Fourth Amendment rights against the promotion of legitimate governmental interests." *Bd. of Educ. v. Earls*, 536 U.S. 822, 830 (2002).

Eaton challenges the community program's testing procedures on the ground that the test results lack "scientific reliability." Appellant's Br. 8. That is not an everyday Fourth Amendment claim. Most constitutional challenges go to whether the government had a

sufficient interest to justify the tests. *See, e.g.*, *Earls*, 536 U.S. at 835. And some go to whether the government violated the individual's reasonable expectations of privacy in implementing the test or sharing the results of it. *See, e.g.*, *Ferguson v. City of Charleston*, 532 U.S. 67, 80–81 (2001); *Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695, 698–99 (6th Cir. 2011). But Eaton's challenge does neither. He has no qualms with the test in either respect.

He instead raises what looks, to the trained and untrained eye, like an evidentiary challenge to the reliability of the test results—to whether the state court could rely on them in making its custody decision. Of course, Eaton should have raised any *such* challenge in state court, not federal court, and should have relied on evidence law, not the Federal Constitution, in doing so. But the two types of challenges—evidentiary and constitutional—are not mutually exclusive, and an utterly unreliable—read random—testing procedure might well violate the Fourth Amendment, if not the due process requirements of the Fourteenth Amendment. Procedures that generate results that are not close to "accurate in the overwhelming majority of cases," *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 632 n.10 (1989), may themselves cause testing to be unreasonable in the Fourth Amendment sense. That explains why the Court has mentioned accuracy as one factor that informs the reasonableness inquiry. *See, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 n.2 (1989); *Skinner*, 489 U.S. at 632 n.10; *see also Schmerber v. California*, 384 U.S. 757, 771–72 (1966); *Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361, 385–86 (6th Cir. 1998).

That it may be possible to conceive of such a constitutional challenge, however, does not mean that Eaton has made a cognizable one. He never argues that the community program's testing creates random results; he argues only that better procedures were available. We need not decide exactly what it takes to raise a cognizable Fourth Amendment claim or indeed how a Fourth Amendment claim would work in this area. Whatever the nature of such a claim, Eaton's bare bones arguments cannot survive summary judgment either way.

Lexington introduced ample evidence to justify its drug-testing program. A State and its municipalities have an "urgent interest in the welfare of" children, especially in the context of resolving competing parental claims for custody of a child. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981). The drug tests—for the father *and* mother—furthered this interest by

allowing the family court to make an informed decision about the child's well-being.  And of course the tests were undertaken in connection with a court order, lessening Lexington's burden relative to "suspicionless" drug testing conducted in the absence of judicial authorization.  *See Earls*, 536 U.S. at 830.  Judicial authorization assures the subject of the search "of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States v. Chadwick*, 433 U.S. 1, 9 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991).

In support of its position, Lexington also filed several exhibits explaining the privacy protections that the community drug-testing program used.  *First*, its employees are well-trained.  Employees must learn all proper procedures, with those who operate the testing equipment required to undertake extensive additional training and testing.  And the American College of Pathologists subjects the program to proficiency testing several times per year.  Nothing in the record indicates the drug-testing program ever failed.

*Second*, the drug-testing program has a well-scripted set of procedures.  It operates a uniform check-in system.  It guides employees on how to ensure subjects give legitimate samples, including where necessary observing subjects provide their samples.  Each specimen cup is labeled with the subject's identifying information.  Testing equipment and samples are stored behind lock and key.  Technicians typically perform the same set of drug and alcohol screens on all samples.  If a sample comes back positive, the program will not report it until confirmed by a second test.  If a subject does not agree with a positive result, he may ask to send the sample to an independent lab for additional testing at his expense.

*Third*, the program uses a reliable means of testing its samples.  It performs all tests through the "enzyme-multiplied immunoassay technique," a procedure that courts have found reliable, *see Higgs v. Bland*, 888 F.2d 443, 449 (6th Cir. 1989); *see also Somers v. State*, 368 S.W.3d 528, 537–42 (Tex. Crim. App. 2012) (collecting cases).  Some other tests, it is true, have lower error rates. *See Feliciano v. City of Cleveland*, 988 F.2d 649, 657 (6th Cir. 1993); *see also* 18 U.S.C. § 3583(d); 73 Fed. Reg. 71,858, 71,892–93 (Nov. 25, 2008).  But this program's technique is "among the most consistently accurate drug testing methods," is "quick [and]

relatively inexpensive, and can be operated by people who are not scientific experts." *Somers*, 368 S.W.3d at 537 (quotations omitted).

These reasonable procedures, taken together with Lexington's substantial interest in ordering the drug tests in the first place, satisfied Lexington's initial burden of "informing the district court of the basis for its" summary judgment motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once Lexington made this showing, it fell to Eaton to demonstrate a "genuine dispute as to any material fact" and to show that Lexington was not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). He never did so.

Eaton never challenged the reasonableness of the drug testing by attacking the governmental interests that justified the program. He thus did not argue that Lexington had no interest in conducting the drug testing or that the family court was wrong to order it. Eaton also never challenged the reasonableness of the drug testing on the ground that it violated his privacy. *Cf., e.g.*, *Ferguson*, 532 U.S. at 82–84; *Acton*, 515 U.S. at 658; *Norris*, 641 F.3d at 700–02; *Knox Cty. Educ. Ass'n*, 158 F.3d at 380–82.

Eaton argued only that the testing program was unreasonable because it failed "to ensure the integrity of the specimens and the reliability of the test results." Appellant's Br. 5. Yet Eaton does not point to *any* evidence showing that the testing procedures produce inaccurate results. There indeed is no such evidence in the record: no deposition testimony showing that the procedures were ignored; no expert affidavit on the procedure's flaws; no documentation that positive results were often mistaken. Because Eaton did not present any probative evidence that would support his § 1983 claim, Lexington is entitled to summary judgment.

Eaton's main argument turns on a legal point—that the Supreme Court, he claims, has already held that urinalysis procedures *must* contain six features that render them "professionally valid." Appellant's Br. 8–9. That would be news to the Court. It has never said any such thing. The Court, it is true, has mentioned some or all of Eaton's six features in discussing urine-testing regimes at various times. *See, e.g.*, *Acton*, 515 U.S. at 650–51; *Von Raab*, 489 U.S. at 661–63; *Skinner*, 489 U.S. at 609–12. But it has never *mandated* these procedures as the be-all-and-end-all test of reasonableness, much less required all six. To the contrary, it has held that it was not

"*per se* unreasonable" for a drug-testing regime to lack something the Court had mentioned in upholding a different testing program. *Acton*, 515 U.S. at 659. That's because the Court "eschew[s] bright-line rules" for Fourth Amendment interest-balancing tests, "instead emphasizing the fact-specific nature of the reasonableness inquiry." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

Courts have consistently accepted drug-test results in the face of Fourth Amendment challenges, moreover, that do not have one or more of these supposed requirements. While Eaton claims that a lab must confirm test results "at a different location [using] a different process," Appellant's Br. 11, several courts have deemed urine-test results reliable when, like the ones obtained here, they involved confirmation at the same lab using the same immunoassay method. *See, e.g.*, *Higgs*, 888 F.2d at 445, 449; *Spence v. Farrier*, 807 F.2d 753, 756 (8th Cir. 1986); *Lahey v. Kelly*, 518 N.E.2d 924, 928 (N.Y. 1987); *see also* 5 David L. Faigman et al., Modern Scientific Evidence § 40:12 (2015–16 ed.). The decision that Eaton points to as coming to a different conclusion, *Jones v. McKenzie*, 628 F. Supp. 1500 (D.D.C. 1986), provides little support, as the D.C. Circuit reversed that decision in view of the Supreme Court's earliest urine-testing cases, *see Jones v. McKenzie*, 833 F.2d 335, 340–41 (D.C. Cir. 1987), *modified sub nom. Jones v. Jenkins*, 878 F.2d 1476, 1477 (D.C. Cir. 1989) (per curiam). Eaton also overlooks the reality that confirmation at another lab, by another method, *was* available to him, albeit at his expense.

Courts likewise have accepted evidence that is out of step with some of Eaton's other proposed requirements. While Eaton argues that only "professionally trained" staff in "regulated and certified laboratories" may perform urinalyses, Appellant's Br. 8, this court and others have upheld testing that does not fit those descriptions, *see, e.g.*, *Knox Cty. Educ. Ass'n*, 158 F.3d at 385–86; *Burka v. N.Y.C. Transit Auth.*, 739 F. Supp. 814, 831–32 (S.D.N.Y. 1990). That courts do not insist that other programs use the immunoassay test in other settings—say with professional staff in regulated labs—should come as no surprise. This is "a purely mechanical" test, one "requiring the operator to exercise no discretion, read no graphs and make no subjective interpretations" and one that is well-suited to a community drug-testing program. *Peranzo v. Coughlin*, 608 F. Supp. 1504, 1505 (S.D.N.Y. 1985).

Eaton adds that the drug-testing program violated the Fourth Amendment because it lacked a "chain of custody" and a "tamper-proof custody seal." Appellant's Br. 8–9. That is not true. It requires samples to be labeled, sealed, and stored in specific ways.

Even if we mine the record for all that might be marshaled to support Eaton's position, just two facts (potentially) help Eaton. The first is that the American College of Pathologists "recommends" that its evaluations of this testing program "not be used as a sole criterion for judging the performance of any individual clinical laboratory." R. 68-2 at 93. That fact may weaken Lexington's argument that the program's procedures *are* reasonable. But it does not show that its procedures are *unreasonable*. The second is that, in an affidavit that Eaton filed in the family court, *he* said he does not use drugs or alcohol. But the whole point of drug testing is to test such denials, not to accept them on faith. When it comes to reliability in this area, experience has shown that positive drug tests tend to be more reliable than positive denials by the subjects of the test. In the face of the abundant evidence suggesting that this drug-testing program strikes a reasonable balance between government interest and privacy intrusion, Eaton's say-so cannot create a triable issue of fact.

In the last analysis, Eaton appears to misunderstand what he had to do to respond to Lexington's summary judgment motion. Eaton complains that, if there were a trial, he could show that the drug-testing program used "improper calibration settings of the [testing] equipment," and he claims that he has "boxes of evidence accumulated." Appellant's Br. 21, 24. On top of that, he wants an opportunity to present to a jury "evidence, witness testimony and expert opinions." Reply Br. 6. Problem is, that opportunity has come and gone. The point of summary judgment, "an integral part of the Federal Rules," is to test before trial whether a trial is needed, whether, that is, each side has produced sufficient evidence to permit a reasonable jury to rule for it. *Celotex*, 477 U.S. at 327. If Eaton had the evidence, he should have introduced it in response to Lexington's summary judgment motion. When he failed to do so, that entitled Lexington to summary judgment under time-tested principles established by Civil Rule 56.

For these reasons, we affirm.