RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0023p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SABRINA JORDAN, as the Administrator and o/b/o the
Estate of Jamarco Dewayne McShann,

*Plaintiff-Appellant*,

*v.*

JOHN S. HOWARD; JERRY KNIGHT; BRIAN O'NEAL;
MICHAEL CORNELY,

*Defendants-Appellees*.

No. 20-3274

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:18-cv-00082—Thomas M. Rose, District Judge.

Argued: December 4, 2020

Decided and Filed: February 3, 2021

Before: SILER, CLAY, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Alxis Rodis, Dwayne D. Sam, WILLIAM & MARY APPELLATE AND
SUPREME COURT CLINIC, Williamsburg, Virginia, for Appellant. Kelly M. Schroeder,
FREUND, FREEZE & ARNOLD, Dayton, Ohio, for Appellees. **ON BRIEF:** Alxis Rodis,
Dwayne D. Sam, WILLIAM & MARY APPELLATE AND SUPREME COURT CLINIC,
Williamsburg, Virginia, Sarah Gelsomino, Jacqueline Greene, FRIEDMAN & GILBERT,
Cleveland, Ohio, for Appellant. Kelly M. Schroeder, Bryan J. Mahoney, FREUND, FREEZE &
ARNOLD, Dayton, Ohio, Kimberly A. Rutowski, LAZARUS & LEWIS, LLC, Cincinnati, Ohio,
for Appellees.

GRIFFIN, J., delivered the opinion of the court in which SILER, J., joined. CLAY, J.
(pp. 15–26), delivered a separate dissenting opinion.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.

During the early morning hours of October 20, 2017, Jamarco McShann was asleep in the driver's seat of a locked, running car with his right hand resting on a pistol in his lap and music blaring from the car stereo. Just seconds after police officers roused him from his slumber, McShann stopped complying with their orders that he keep his hands up and away from the gun. He instead reached down, grabbed the gun, and swung it towards the driver-side door, where two officers were positioned. Fearing for their safety and that of their fellow officers, Officers Jerry Knight and John Howard opened fire, shooting and killing McShann. The district court concluded their use of deadly force was reasonable and therefore granted summary judgment in their favor on excessive force claims brought by McShann's estate. We affirm.

I.

A.

While working third-shift patrol on October 20, 2017, defendant Jerry Knight, a police officer with the Moraine Police Department, responded to a noise complaint coming from a vehicle at the Valley View Apartment Complex in Moraine, Ohio. Two other officers, defendants John Howard and Michael Cornely, also chimed in over radio to let Knight know that they would respond to provide backup.

Knight was the first to arrive, so he set out to find the source of the noise complaint. He spotted one vehicle emitting exhaust and realized that music was coming from the car stereo. Knight approached and saw a man later identified as Jamarco McShann asleep, reclined in the driver's seat with his left hand behind his head. Knight noticed that McShann was resting his right hand on a handgun with an extended magazine on his right thigh. Knight retreated and regrouped with Officer Cornely, who had just arrived at the scene and parked his squad car behind McShann's car. Officer Howard soon joined the pair, and the trio discussed how they

would safely wake McShann to resolve the noise complaint. The officers also ran the vehicle's plates and determined that it was registered to a woman who lived in the Valley View complex. The officers then attempted to find the woman at her apartment but were unsuccessful.

By now, it was approaching 5:30 A.M., and the officers were worried about resolving the situation before other apartment residents began going about their daily business. They devised a plan to approach the vehicle and requested additional officers respond to the scene with a ballistics shield as an additional safety precaution. Officer Brian O'Neal and Detective Justin Eller arrived on the scene with the requested ballistics shield about ten minutes later.

Collectively, the officers decided that Knight would approach the driver-side door to make contact with McShann and that O'Neal would use the ballistic shield to provide cover to Knight. Howard would be positioned at the rear of the vehicle with a shotgun to provide cover. Cornely approached the passenger-side of the vehicle to provide additional light and cover. Detective Eller stayed back by the patrol car to watch the backs of the four officers. Up to this point, there is no real dispute about what occurred. From here on, we shift to retelling the officers' individual accounts to provide a full picture of the crucial moments that left McShann gravely injured.

Officer Knight, accompanied by O'Neal, approached the vehicle and attempted to wake McShann by rapping his heavy flashlight against the glass of the driver-door window. Knight observed that McShann's position had not changed; his left hand remained behind his head and his right hand was resting on the gun, on his right thigh. The gun was laying flat with the muzzle facing the driver-side door. After five or ten seconds of Knight banging the flashlight against the window, McShann woke and Knight recalled that he moved his left hand from behind his head and took his right hand off the gun. While the officers shouted "show me your hands," Knight says that McShann sat up and looked around at the officers on each side of the car, slightly twisting his body back and forth twice to scan the area with his hands raised. But then, Knight asserts, McShann reached back down to pick up the gun. Knight saw McShann raise the gun "in [his] direction," but that he wasn't sure the muzzle "ever actually specifically pointed" at him. When Knight saw McShann pick up and swing the gun in his direction, he "started shooting [his] firearm and backpedaling" in tandem with O'Neal. While Knight tried to keep his eyes on

McShann's hands as he backed away from the vehicle, glass from the vehicle was shattering and his muzzle was flashing in front of him with each shot, so he could not keep his eyes on McShann's gun the entire time. Knight testified that he shot until the threat was eliminated—when he realized that McShann was no longer facing towards the driver-side window but was instead facing forward, and the gun was no longer in his hand. At that point, Knight knew McShann had been shot.

Officer O'Neal carried the ballistics shield to the driver-side door to provide cover for Knight. He testified that he had "eyes on" McShann from the approach until the time McShann was shot. O'Neal testified that when McShann was roused from his slumber, he sat up and looked at the officers outside the car from left-to-right, and then again from left-to-right. He recalled that McShann's right arm "stayed down by the weapon" during the "scans." But once McShann completed the second scan, O'Neal says that McShann "looked back at Jerry Knight and [O'Neal's] position, grabbed his weapon[,] and swung it up towards [O'Neal]." While Officer O'Neal had his weapon drawn, he did not shoot because he heard Knight's shot and was worried about getting in Knight's line of fire. Once Knight began shooting, O'Neal retreated with him, continuing to provide cover with the ballistic shield.

Officer Cornely observed from the passenger-side of the vehicle as Knight woke McShann. He remembered that the officers immediately began identifying themselves and instructing McShann to keep his hands up and away from the gun. Cornely stated that when McShann woke, he raised his left hand with his palm exposed, but that he lifted his right hand only partially up, off the gun—"just hovering above the pistol"—and that he would not "bring it the rest of the way up." Then, Cornely testified that with his hand hovering over the gun, McShann "started scanning, looking side to side in the vehicle." After two or three looks back-and-forth of the officers on both sides of the car, Cornely claims that McShann began "to turn his head back toward the driver's side of the car," and "reache[d] down and pick[ed] the gun up with the muzzle pointed at the driver's side door." Although the barrel of the gun had always been positioned roughly in the direction of the driver-side door, Cornely testified that it had been resting at an angle towards the driver's mirror, but once McShann grabbed it, "he swung the muzzle straight to the left[,] right at the driver's side door where [Knight and O'Neal] were

standing." Cornely did not fire his service weapon and "started backing away [from the car]," because he was concerned that the "officers on [the other] side of the car were probably going to open fire." He explained that because McShann was seated in the driver's seat, it would have been a harder and more perilous shot for him to make across the car from the passenger side of the vehicle, and he "would have endangered [his] guys on the other side of the car" by shooting.

Officer Howard, positioned at the rear of the vehicle, testified that he saw McShann wake up and move his hands to "mid range," meaning that they were neither in his lap, nor fully extended in the air, which Howard found "encouraging." He observed that McShann slowly "scanned" the vehicle and the surrounding officers two or three times. Then, Howard said that he saw McShann's "hand reaching for the gun," and "grabb[ing] the gun with his right hand." Once Howard saw McShann reach for the gun, he perceived a deadly threat to himself and his fellow officers, so he "shifted [his] attention" from the gun "to . . . the left a little to center mass and [he] pulled the trigger." Unlike Knight, O'Neal, and Cornely, Howard testified that he did not know if McShann had ever pointed the gun at Knight and O'Neal because he "stopped focusing on the gun" once McShann reached down and grabbed it.

Once the shooting stopped, the officers called for backup and medical assistance. Knight reached through the broken window of driver's side rear passenger door and "kind of crawled through the back a little bit up over [McShann's] left shoulder," to unlock McShann's door. Knight and O'Neal pulled McShann onto a grassy area nearby to begin first aid and applied pressure to McShann's bullet wounds to slow the bleeding until paramedics arrived.

Tragically, McShann died as a result of his injuries. The medical examiner's autopsy concluded that he was struck by at least six gun shots. Knight shot his pistol eight times and struck McShann at least four times—twice in his right arm, once in his right hand, and once in his upper left arm. Howard's two shots struck McShann in the middle of his back and in his right arm and right torso.

Jeremy Bauer, Ph.D., a certified accident reconstructionist and expert on biomechanics, was retained by plaintiff to prepare an expert report. His report summarized the forensic evidence relating to the shooting, the autopsy results, and testimony from the defendants. After

reviewing the evidence, he declared that "[b]ased on [his] review of the case and analysis of this case and on [his] background, education and training in the fields [of] anatomy, physics, injury biomechanics, forensic photography[,] and shooting incident reconstruction," he could conclude to "a reasonable degree of scientific and biomechanical certainty, that Mr. McShann's right hand was raised in front of him, near shoulder level when he was shot in the base of the right thumb." Bauer further reasoned that "[t]he lack of damage to the gun provides clear evidence that Mr. McShann was not holding the gun when he was shot in the hand." Bauer offered no other opinions in his expert report.

B.

Plaintiff Sabrina Jordan, as the administrator and personal representative of McShann's estate, filed suit against the officers in March 2018. She pleaded a claim under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment's prohibition on unreasonable seizures and related state-law tort claims for wrongful death, civil conspiracy, and assault and battery. When discovery closed, defendants moved for summary judgment on plaintiff's § 1983 claim and urged the court to decline supplemental jurisdiction over the state-law claims.

The district court granted the motion and entered judgment in favor of the defendants on the basis of qualified immunity. It concluded that even accepting the facts set forth in Bauer's report, the officers acted reasonably because there was no disputing that "McShann was pointing a gun at Knight at the time he was shot." And it alternatively concluded that Bauer's report was not sufficiently reliable under the *Daubert v. Merrell Dow Pharmaceuticals* standard for expert testimony. *See* 509 U.S. 579 (1993). Finally, the district court declined supplemental jurisdiction over the state-law claims and entered judgment in favor of the defendants.[1] Plaintiff timely appealed.

---

[1]While plaintiff originally named Detective Eller as a defendant, she voluntarily dismissed her claims against him prior to the motion for summary judgment. She also disavowed her claims against Officer O'Neal in her response to the motion for summary judgment and indicated that she would pursue only her state-law claims against Officer Cornely. Accordingly, the only claims presented for review are the excessive force claims against Knight and Howard.

II.

We review the district court's summary judgment determination de novo. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual issue is genuinely in dispute if a reasonable factfinder could resolve it either way. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a disputed issue of fact is material to liability, premature entry of summary judgment inappropriately supplants the role of the factfinder in adjudicating liability. *See id.* at 248–49. Denial of summary judgment where there is no genuine dispute of material fact, on the other hand, improperly permits a claim to go to the factfinder even though there can be only one possible outcome. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson*, 477 U.S. at 250–52. In determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 251–55. "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 281 (6th Cir. 2012) (internal quotation marks omitted).

III.

A.

Resolution of this case requires only application of our well-established summary judgment standards to the law governing the use of force by police officers.

The parties agree that the federal right at issue here is the right to be free from excessive force during a seizure, which is secured by the Fourth Amendment. *See* U.S. Const. amend. IV. It is undisputed that Officers Knight and Howard "seized" McShann by shooting him, thereby triggering the Fourth Amendment's "reasonableness" requirement. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of

deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and some internal quotation marks omitted). In *Garner*, the Supreme Court held that the reasonableness of using deadly force to subdue a suspect depends upon whether "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11.

This objective test requires courts to judge the use of force from the perspective of a reasonable officer on the scene, "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. While there are three factors to be considered, we are primarily focused on the second factor—whether the suspect poses an immediate threat to the safety of the officers or others. *Id.* at 396; *see also Garner*, 471 U.S. at 8–9. This is because an officer's use of deadly force is objectively reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. Additionally, our approach requires that we "evaluate the use of force by focusing on the split-second judgment made immediately before the officer used allegedly excessive force, not on the poor planning or bad tactics that might have created the circumstances that led to the use of force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (internal quotation marks omitted).

The record here demonstrates the defendant officers' use of deadly force was objectively reasonable. Three of the four officers surrounding McShann's vehicle testified that when McShann woke, he was compliant or mostly compliant with their order that he put his hands up. (Officer O'Neal testified that he was not sure whether McShann put his hands up.) But then, after looking back and forth at the officers surrounding the vehicle for a few seconds, all four officers testified that McShann grabbed his gun. At this point, Officer Howard perceived a serious and deadly threat to himself and his fellow officers and took aim at McShann's "center

mass"—necessarily taking his vision away from the gun itself. While that process was playing out, the other three officers agree that McShann "swung" the gun towards Officer Knight at the driver-side window. Officer Knight testified that he feared for his safety once McShann swung the gun towards him. At that point, both Officers Knight and Howard used deadly force.

Given these unrebutted facts, we conclude that both Officers Howard and Knight acted reasonably to stop a serious threat of deadly force, and the district court correctly granted them qualified immunity. In other words, when an initially compliant suspect stops following officer commands and instead grabs a readily accessible firearm, an officer "need not wait for [the] suspect to open fire on him . . . before the officer may fire back." *Greathouse v. Couch*, 433 F. App'x 370, 373 (6th Cir. 2011); *cf. Mullins v. Cyranek*, 805 F.3d 760, 768 (6th Cir. 2015) (affirming grant of qualified immunity where officer used deadly force in response to a suspect pulling out a previously concealed weapon and throwing it over the officer's shoulder, because the suspect earlier "had his finger on the trigger of a gun, and at that time, he posed a serious threat to [the officer] and the general public"); *id.* ("This is not a case where a jury could conclude that [the police officer] was not in any danger in the first place." (internal quotation marks, brackets, and citation omitted)).

B.

Plaintiff's arguments to the contrary focus on alleged inconsistencies between the officers' testimony. Based on the officers' supposed lack of credibility, and the conclusions of her expert witness, plaintiff claims that there are one or more genuine disputes of material fact that precluded summary judgment in favor of the officers. Her arguments are not meritorious.

First, we do not agree that the Bauer report creates a genuine issue of material fact regarding whether McShann was holding the pistol at the time the officers decided to use deadly force shooting—the pivotal issue in this case.**²** Remember, Bauer opined only that McShann's

---

**²**We recognize that even if it was reasonable for the officers to open fire, "that does not automatically clear the entire encounter of the Constitution's prohibition against the use of excessive force." *Hood v. City of Columbus*, 827 F. App'x 464, 469 (6th Cir. 2020). Here, however, plaintiff's argument hinges on whether the use of deadly force was justified from the outset, which means that we do not need to apply a segmented analysis to each of the shots fired by Knight and Howard.

right hand was raised in front of him at the time he was shot in the hand, and that the "lack of damage to the gun" provides "clear evidence that Mr. McShann was not holding the gun when he was shot in the hand." Plaintiff suggests that the Bauer report creates a material factual dispute for trial because, in her view, a reasonable juror could conclude from it that McShann was not holding his gun at the time the officers *began* firing—meaning that their use of deadly force was not justified. However, *Boyd v. Baeppler* forecloses that argument. 215 F.3d 594 (6th Cir. 2000).

In *Boyd*, we considered whether an analogous expert report created a genuine dispute of material fact for trial. Officers responding to a "shots fired" call observed a man matching the description and armed with a gun running toward them. *Id.* at 597–98. The officers identified themselves, but the man, later determined to be Adolph Boyd, did not stop, nor did he drop the gun—despite orders from the officers. *Id.* at 598. One officer, Baeppler, "fired three to four rounds," but Boyd responded by pointing his weapon at the other officer, Wilsman. *Id.* at 603. Wilsman fired one round from his shotgun, and Boyd fell forward to the ground. *Id.* Then, Boyd allegedly "lifted his torso and turned to point his weapon" again at Wilsman. *Id.* At that point, Baeppler fired seven more rounds at Boyd, until he dropped the weapon. *Id.*

On appeal, we observed that the only "inconsistent evidence" to suggest that Baeppler's second use of force was not justified came from the plaintiff's expert, Dr. Tucker, who opined that "Boyd might not have been able to turn and point his weapon" after the shotgun blast knocked him to the ground, thus suggesting that the final seven rounds fired by Officer Baeppler were an unreasonable use of force. *Id.* (internal quotation marks omitted). We were not persuaded:

> In sum, Dr. Tucker made assumptions about the sequence of shots and the pathways of the bullets and concluded, not within a reasonable degree of medical certainty, but only 'with probability' that a more likely scenario was that Boyd was unable to lift his torso and twist to threaten [O]fficer Wilsman a second time. Nowhere does Dr. Tucker point to any forensic evidence that proves what shot(s) rendered Boyd unable to lift and twist his torso, or at what point during the sequence of events the critical shot(s) hit Boyd.

*Id.* at 603.  The court therefore reversed the district court's denial of qualified immunity because the "[t]he speculation of plaintiff's expert [was] not sufficient evidence to create a genuine issue of material fact." *Id.*

This case is *Boyd* all over again.  Bauer, like Dr. Tucker, cannot tell us the sequence of shots, and his report does not contradict that McShann stopped following officer commands and picked up the gun in his lap.  Instead, his report tells us *only* that by the time one of Knight's eight shots struck McShann's right hand, there is "clear evidence" that McShann was not holding the pistol.  *Boyd* instructs that such speculation is not enough to controvert consistent officer testimony to the contrary and generate a genuine dispute of material fact for trial.[3]

Second, Jordan's attempt to supplement this speculation with what she says is inconsistent testimony by Officer Knight is not persuasive.  She claims that Officer "Knight testified that (i) he maintained a visual on McShann's hands at all times, (ii) McShann maintained his posture with his body turned, and the gun pointed in Knight's direction for the duration of the shooting, and (iii) Knight never saw McShann drop, throw, or otherwise dispose of the gun."  Plaintiff theorizes that if this testimony is taken as true, then the Bauer report must create a genuine dispute of fact for trial because "if the gun remained in McShann's hands . . . why didn't [it] sustain *any* damage after Knight shot McShann in his right hand?"

But this argument rests on a false premise—one created by Jordan's distortion of Officer Knight's testimony.  Knight testified that he "tried" to keep his eyes on McShann's hands during the shooting.  And despite repeated attempts by plaintiff's counsel to get Knight to concede that Knight kept his eyes on McShann's gun "the entire time," Knight refused.  Instead, he was insistent he "attempted to" do so, but he was "not a hundred percent" because at the same time he tried to watch the gun, he was also "backpedaling" to safety and "trying not to trip," while dealing with glass shattering "in his face" and muzzle flashes from his weapon obstructing his vision.  Knight also said that he shot until he got behind cover, and "when [he] stopped shooting, that's when [he] noticed the gun was no longer in [McShann's] hand because he had been shot."

---

[3]For this reason, we need not address the district court's alternative ruling that the Bauer report was based on improper speculation and could not be properly applied to the facts at issue as *Daubert* requires.

In sum, Knight's testimony establishes that McShann picked up the gun, but sometime in the next ten seconds—as Knight struggled to maintain concentration amidst a rapidly developing scene—McShann dropped or was dispossessed of the gun. There is no contradiction between this testimony and Bauer's conclusion that McShann was not holding the gun at the time he was shot in the hand. And thus, because the unrebutted testimony establishes that McShann disregarded officer commands, picked up the gun, and pointed it towards Knight, any reasonable juror would conclude that Knight's use of deadly force was justified.

Third, Jordan claims that Howard testified that "McShann never moved the gun in front [of] his body or pointed the gun at the officers" and that Knight and Howard both testified that they "maintained a visual on McShann's hands at all times." From these assertions, she argues that *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012), supports the conclusion that a reasonable juror could "'find, based upon the forensic evidence, expert testimony, and common sense that [McShann] did not' hold or point a gun at the officers just before he was shot." We disagree.

As a factual matter, these assertions are not borne out by the record. First, as described above, Knight's testimony establishes only that he did not keep his eyes on McShann's gun for the length of the encounter. Furthermore, Howard's testimony was that he saw McShann reach for the gun, and at that point, perceived that McShann presented a serious threat of deadly force and began taking aim, necessarily diverting his attention from McShann's hands. Howard was clear that he *did not know* whether McShann had swung the gun at Knight or otherwise pointed it at the officers. As we put it in *Presnall v. Huey*, "[a]n explained absence of evidence in this context is not evidence of absence." 657 F. App'x 508, 512 (6th Cir. 2016). Officer Howard explained in detail why he did not know whether McShann swung the gun at Knight, and we do not expect officers to observe and recall facts *identically* from different vantage points in the midst of high-stress and fast-moving situations. At best, this supposed conflict pointed out by plaintiff only "creates 'metaphysical doubt'" as to the material facts, which is not enough to counter a motion for summary judgment. *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

And as a legal matter, *King v. Taylor* does not command a different result. There, we reversed a grant of qualified immunity to a police officer who shot and killed a suspect while

attempting to execute an arrest warrant at the suspect's home.  694 F.3d at 653–54.  After a review of the evidence in the light most favorable to the plaintiffs, the *King* court held that reasonable jurors could conclude from "the forensic evidence, expert testimony, and common sense" that the decedent "did not threaten the officers by pointing a gun at them just before he was shot," as the officers had claimed.  *Id.* at 662.  First, the *King* court pointed to evidence from the autopsy which suggested that the bullet trajectory of the only fired shot was markedly inconsistent with the officers' testimony that the decedent was standing and pointing a gun and instead supported "plaintiffs' theory that King was shot while lying on his couch, not making any threatening gestures."  *Id.* at 662–663.  Second, the court observed that plaintiffs' experts also contradicted the officers' version of events, because two medical experts opined that based on where King was shot in the head, he would have immediately lost motor function, in which case, if the officers' testimony was true (and King was standing and pointing a gun), the gun should have ended up on the floor rather than in King's lap.  Based on this evidence, we concluded that "[w]hat exactly happened just before King was shot [was] a question for the jury" because "both sides' theories of what transpired [were] sufficiently supported by evidence in the record."  *Id.* at 663.

The evidence in this case does not point in multiple directions like it did in *King*.  There is nothing akin to the bullet trajectory evidence we had there, which blatantly contradicted the officers' account that the decedent was standing and pointing a gun at them.  And moreover, the Bauer report is missing the critical evidentiary link to tie his opinion to the relevant legal question; it sheds no light on the sequence of shots, and thus whether McShann had grabbed the handgun at the time the police opened fire.

Fourth and finally, we find no merit in plaintiff's second-guessing of one officer's decision to use deadly force (Howard) and another's decision not to (Cornely).  Regarding Howard, he testified that he perceived a threat of deadly force at the moment McShann reached for the gun.  Plaintiff says this shows Howard acted prematurely because Officer Knight did not perceive a serious threat of deadly force until McShann pointed the pistol at him.  However, the relevant inquiry is objective, not subjective.  Even if Knight and Howard had different subjective beliefs about when the need to use deadly force arose, the relevant inquiry is whether a

reasonable officer in Howard's shoes would have perceived a serious threat of deadly force at the time McShann stopped following officer instructions and instead grabbed the pistol in his lap. And as we have already explained, a reasonable officer in that situation would perceive a serious threat of deadly force.

Leveraging Cornely's decision not to shoot, plaintiff says that under *Brandenburg v. Cureton*, the reasonableness of the police shooting must go to a jury to "consider why" some officers did not fire "if it was quite obvious that they were being threatened with imminent bodily harm." 882 F.3d 211, 215 (6th Cir. 1989). But that matter involved three officers who, in close physical proximity, faced the same decision of whether to shoot or not in response to having a gun pointed at them. *Id.* at 213. Only one of the three opened fire. *Id.* We held that there was sufficient evidence for a trial because expert testimony contradicted the testimony that Brandenburg was pointing the gun, and "[f]urthermore, the jury might reasonably consider why the two other officers did not fire shots if it was quite obvious that they were being threatened with imminent bodily harm." *Id.* at 215. That is not what we have here. For one, Cornely faced a decidedly different situation—McShann never pointed the gun in his direction, and Cornely was acutely aware that if he fired across the vehicle, he risked hitting either Officer Knight or O'Neal. Moreover, the officers had planned for Howard to be positioned behind the vehicle with a shotgun, specifically so that the other officers "probably wouldn't even need to shoot" because he "would be able to stop the threat pretty quickly." Thus, unlike *Brandenburg*, a reasonable juror could not conclude from Cornely's *inaction* that the use of force by other officers was objectively unreasonable.

* * *

"Time and time again, we have rejected Fourth Amendment claims . . . when the officers used deadly force only after the suspects had aimed their guns at the officers or others." *Presnall*, 657 F. App'x at 512 (collecting cases). The uncontroverted evidence here leads to the same result.

IV.

For these reasons, we affirm the judgment of the district court.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. Plaintiff Sabrina Jordan's expert report, in conjunction with the officers' testimony and the autopsy report, established a genuine dispute of material fact regarding whether Jamarco Dewayne McShann held or pointed a firearm at the officers at the time that the officers shot him. When officers use deadly force against an individual, they are only entitled to qualified immunity where there is no genuine dispute of material fact that the officers had probable cause to believe that the individual posed "a threat of serious physical harm." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In the present case, there is a genuine dispute of material fact regarding whether McShann posed a serious threat of physical harm to the officers: the mere presence of a firearm next to McShann in an open carry state while he was in a locked vehicle would not pose an immediate threat of safety to the officers—who surrounded McShann's vehicle while holding firearms and a ballistic shield.

In view of the conflicting testimony and credibility issues, the district court erred when it found no genuine dispute of material fact as to whether McShann held or pointed a gun at the officers and determined that Defendants were entitled to summary judgment based on qualified immunity. I would reverse the district court's grant of summary judgment and remand the case for further proceedings.

**BACKGROUND**

On the evening of October 20, 2017, Officer Jerry Knight was dispatched to the Valley View Apartment Complex for a noise complaint involving a vehicle playing loud music. Officer Knight arrived on the scene about two minutes after the dispatch, and as he got out of his police cruiser, he heard loud music, which seemed to be coming from between the apartment buildings. Knight walked over to the parking lot next to the apartments and eventually located the vehicle playing the music in an adjacent parking lot. When he walked up to the driver's side of the car and shined a flashlight into the vehicle, he saw McShann asleep and reclined in the driver's seat with his left hand behind his head and his right hand resting on a firearm. McShann had the

firearm on his right thigh, with his right hand on the grip area, the muzzle of the firearm facing southwest towards the driver's door at a slant, and the magazine facing the passenger side.

As Knight backed away from the vehicle, Officer Michael Cornely arrived at the parking lot where McShann's vehicle was parked, and Knight informed him that McShann had a gun in the car. Officer Knight tried to open the door on the driver's side, but it was locked. Officer Cornely radioed in that the officers had encountered a weapon, and, soon after, Officer Howard arrived on the scene. The officers decided to run the license plate of the car and found that the plate was registered to a woman who lived in the apartment complex. Cornely tried to make contact with the vehicle owner by knocking on the door of the registered owner's apartment, but no one answered. When Cornely returned to the vehicle, the three officers decided to put stop sticks between the front and rear tires of the car to prevent McShann from leaving the scene. Officer Knight then moved his cruiser and shined a spotlight through the front windshield of the cruiser into McShann's vehicle.

At this point, it was almost 5:30 AM, and music was still blaring from the car—which was only interrupted by intermittent phone calls to McShann's phone. Noting that people living in the apartments would soon begin coming to their vehicles to go to work or to take their children to school, Officers Cornely, Knight, and Howard decided that they wanted to make contact with McShann. Officer Howard contacted dispatch to request that Detective Justin Eller and Officer Brian O'Neal come to the scene with a ballistic shield to provide protection to the officers when they approached the vehicle. The plan was that Officer Knight would make contact with McShann on the driver's side of the car with Officer O'Neal next to him holding the ballistic shield, Officer Cornely would approach on the passenger side and shine a flashlight to illuminate the car, Officer Howard would stand behind the car with a firearm as cover more towards the driver's side, and Officer Eller would stand farther behind with a handgun.

Officers Knight, O'Neal, Howard, and Cornely proceeded to approach McShann's vehicle, with Knight near the back of O'Neal's right shoulder and Howard and Cornely close behind. Once Knight and O'Neal reached the driver's side of the car, Knight banged on the driver's window with a flashlight during a brief break in the music, and Knight noted that the

firearm was still resting in the same place on McShann's right thigh.**1** When McShann woke up, the officers screamed, "police," "keep your hands up in the air, and "show me your hands," and McShann sat up in his seat. (R. 15, Knight Dep. at PageID # 90.) Knight and Howard testified that McShann put both his hands up with palms facing forward, while Cornely testified that McShann put his left hand up and had his right hand hovering above the firearm. McShann then rotated twice between turning left to look at Knight and O'Neal and turning right to look at Cornely, while the officers were still yelling commands at him. As he turned to look back at Knight and O'Neal, Knight and Cornely testified that McShann picked up the gun and pointed it in the direction of the driver's side window, although Howard did not see this.**2**

After seeing McShann pick up the gun, Knight began shooting his firearm at the vehicle and backpedaling with Officer O'Neal until they were behind the car to the left of McShann's vehicle, at which point Knight yelled "shots fired." (R. 15, Knight Dep. at PageID # 93.) Officer Howard also fired two shots from his twelve-gauge shotgun into the center of McShann's torso. Although the order of gunshots is unclear, Officer Cornely testified that he heard Knight shoot two handgun rounds before hearing Howard fire his shotgun, and he backed out of the way to get out of their line of fire.

After he stopped shooting, Knight noticed that McShann no longer had the gun on his lap after having been shot; Howard similarly noticed that McShann appeared incapacitated after being shot. Officer Cornely called for more officers to be sent to the scene, and Detective Eller called for a medic. Officer Knight opened up the driver's side passenger door, crawled into the car, and went over McShann's left shoulder to unlock the driver's seat door. Officers Knight and O'Neal proceeded to pull McShann out of the car and lay him down in the sidewalk area nearby to begin performing First Aid until the medics arrived. McShann had sustained several gunshot wounds on his neck, wrist, arm, and back, which ultimately killed him.

---

**1**Cornely testified to seeing the muzzle of the gun pointed northwest towards the driver's side mirror as opposed to southwest towards the driver's side door.

**2**In his deposition, Cornely said that the firearm was "pointed directly at the door," whereas Knight testified that McShann was pointing the firearm in his direction. (R. 17, Cornely Dep. at PageID # 308; R. 15, Knight Dep. at PageID # 91.) Howard saw McShann grab the gun but did not see him point the gun at any of the officers.

On March 20, 2018, Plaintiff Sabrina Jordan filed a complaint on behalf of McShann's estate against Defendants under 42 U.S.C. § 1983 for violating McShann's rights under the Fourth and Fourteenth Amendments to be free from unreasonable seizures based on the use of excessive force as well as for a number of claims under Ohio law.**3**  Defendants filed a motion for summary judgment claiming that Plaintiff could not establish a genuine dispute of material fact for trial and that the officers were protected by qualified immunity—because they did not violate McShann's clearly established rights by using deadly force in response to threatened deadly force.  Plaintiff argued in response that there were genuine disputes of material fact as to whether McShann was holding a gun at the time he was shot and whether he picked up the gun and pointed it at the officers.  Plaintiff cited her expert report prepared by Jeremy Bauer, a certified accident reconstructionist, who "concluded that McShann could not have been holding a gun when he was shot in the right hand" because the gun sustained no damage, and pointed to testimonial disputes among the officers as to whether McShann pointed a gun at them. (Appellant Br. at 10.)

The district court granted summary judgment to Defendants.  The district court found that Defendants were entitled to qualified immunity because they did not violate McShann's clearly established constitutional rights and their use of deadly force was objectively reasonable.  It also determined that Plaintiff failed to establish a genuine dispute of material fact to sufficiently contradict Defendants' physical evidence and testimony.  The district court deemed Bauer's report as irrelevant and unreliable due to its lack of scientific basis, its speculation that McShann was not holding a gun when he was shot in the hand, and Bauer's lack of knowledge about and failure to address the order of gun shots.  This timely appeal followed.

## DISCUSSION

### Standard of Review

We review "a district court's grant of summary judgment *de novo*."  *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).  Because qualified immunity is a legal question, we also

---

**3**The district court declined to exercise supplemental jurisdiction over the state law claims.

review *de novo* "[t]he question of whether a defendant is entitled to qualified immunity from liability under 42 U.S.C. § 1983." *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the burden of showing that no genuine issues of material fact exist." *Rafferty v. Trumbull County*, 915 F.3d 1087, 1093 (6th Cir. 2019). And all reasonable inferences will be drawn in favor of the non-moving party. *Mutchler v. Dunlap Mem'l Hosp.*, 485 F.3d 854, 857 (6th Cir. 2007). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

**Analysis**

The district court erred in finding that there was no genuine dispute of material fact regarding whether McShann was holding or pointing a gun at the officers when he was shot and that the officers were entitled to qualified immunity as a matter of law. Because the Bauer report created a genuine dispute of material fact and the officers were not entitled to qualified immunity, I would reach the district court's alternative ruling that the report was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because it was unreliable and speculative. I would reverse and remand to the district court on this ground because the district court failed to create an adequate record in support of its *Daubert* determination. *See Jahn v. Equine Servs., CSC*, 233 F.3d 382, 393 (6th Cir. 2000) ("[A] district court should not make a *Daubert* determination when the record is not adequate to the task.").

I.      **Genuine Dispute of Material Fact Regarding Whether McShann Held or Pointed a Firearm at Defendants**

The district court first erred by finding that the Bauer report failed to create a genuine dispute of material fact as to whether McShann held or pointed a gun at the officers. Contrary to the district court's findings, we have found expert testimony to establish a genuine dispute of material fact when supported by forensic evidence and "common sense." *King v. Taylor*, 694 F.3d 650, 662 (6th Cir. 2012). In *King*, we held that there was a genuine dispute of material fact as to whether King had pointed a gun at the officers based on the plaintiffs' expert

testimony—supported by forensic evidence and common sense—which concluded that King likely did not have his right arm stretched out towards the defendants before being shot. *Id.* at 663. We determined that the expert testimony put the officers' testimony that King pointed a gun towards them in genuine dispute inasmuch as the expert testimony was consistent with the path of the bullet laid out in the autopsy report, King's right arm having been found on his right hip, and medical expert testimony regarding what happens when an individual's medulla oblongata is severed by a bullet. *Id.* at 662–63. Similarly, in *Greenwell v. Boatwright*, we affirmed the admissibility of expert testimony, supported by the facts, that contradicted eyewitness testimony. *See* 184 F.3d 492, 496 (6th Cir. 1999) ("Expert testimony is not inadmissible simply because it contradicts eyewitness testimony.").

In the present case, in determining that the Bauer report did not create a genuine dispute of material fact, the district court failed to account for evidence in the record that supported Bauer's conclusions and contradicted the officers' testimony. In coming to his conclusions, Bauer reviewed a photograph of McShann's firearm and found that its lack of damage where McShann would have gripped the gun was inconsistent with the theory that McShann had the gun in his hand when the officers shot him. Bauer's conclusions were also consistent with testimony by Officer Howard—who was positioned by the driver's side of the car—that he did not see McShann point a gun at the officers or the driver's side window.[4]

While Bauer noted that the order of gunshots is unknown, he did consider in his report the finding in the autopsy report that the wound in McShann's right hand was caused by Officer Knight's firearm. Officer Cornely also testified that he heard Knight shoot his handgun twice before hearing Howard fire his twelve-gauge shotgun and that the amount of time between the first and last gunshot was a matter of one or two seconds. Knight testified that at most ten

---

[4]The majority argues that Howard's testimony does not create a genuine dispute of material fact because "[a]n explained absence of evidence in this context is not evidence of absence" and Howard explained that he stopped keeping a visual on McShann's hands in order to focus on shooting at McShann. *Presnall v. Huey*, 657 F. App'x 508, 512 (6th Cir. 2016). However, unlike the officers in *Presnall* whose view of the suspect was obstructed, Howard was able to see McShann's hands as he was standing near the rear of the vehicle on the driver's side—he only looked away to take aim at McShann. *See id.* And, given that Howard shot before seeing McShann point the gun at the officers, and that Howard's and Knight's shots occurred within seconds of each other, based on this evidence a reasonable juror could find that McShann was not holding or pointing the gun at the time the officers shot him.

seconds passed between when McShann woke up and when Knight shot at him, meaning that in ten seconds McShann woke up, turned his body left to right twice, and proceeded to move his right hand. Given this evidence, a reasonable juror could find that McShann was not holding or pointing the gun at the time that the officers shot him, thereby not posing a threat of serious harm to the officers. *See infra* Part II.

Contrary to the majority's contention, *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000), does not control the present case. In *Boyd*, we found that the expert report did not create a genuine dispute of material fact as to whether Boyd was unable to turn around and point his gun at the officers after he was shot because "[t]he speculation of [a] plaintiff's expert is not sufficient evidence to create a genuine issue of material fact." *Id.* at 603. We reasoned that the expert report was merely speculative because it did not state its conclusion "within a reasonable degree of medical certainty," "made assumptions about the sequence of shots and pathways of the bullets," and was not supported by the forensic evidence or testimony in the record and was instead based on the expert's review of the autopsy report. *Id.*

Unlike the report in *Boyd*, Bauer's report stated his conclusions "to a reasonable degree of scientific and biomechanical certainty." (R. 25-4, Bauer Aff. and Report at PageID # 1011.) Additionally, Bauer based his report on the facts in the record from the officers' video interviews, noting that Knight indicated that McShann "grab[bed] the gun, raise[d] it up off his lap," whereas Howard stated that McShann's "right hand grabbed that gun and when it did I pulled the trigger." (*Id.* at PageID # 995.) And as discussed above, Bauer's conclusions were more than speculative because they were consistent with the finding in the autopsy report that Officer Knight caused the wound in McShann's right hand; testimony from Officer Cornely indicating that he heard Knight shoot his handgun first, and that the sequence of shots occurred in one or two seconds; and testimony from Officer Howard that he did not see McShann point the gun at the officers before shooting at McShann.

As in *King*, Plaintiff has demonstrated a genuine dispute of material fact sufficient to withstand summary judgment because a reasonable juror could find "based upon the forensic evidence, expert testimony, and common sense" that McShann was not holding or pointing the gun at the officers and therefore did not pose a threat of serious physical harm to the officers.

694 F.3d at 662. And the inconsistencies among the officers' testimony, the Bauer report, and the evidence in the record amount to credibility issues and weighing of evidence that should be left to the jury. *See Anderson*, 477 U.S. at 249 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Accordingly, the district court erred when it determined that the Bauer report did not create a genuine dispute of material fact sufficient to withstand summary judgment and failed to take into account the evidence in the record supporting Bauer's conclusions.

## II.    Defendants' Entitlement to Qualified Immunity

The district court also erred by finding that the officers were entitled to qualified immunity for their use of deadly force in this case. In *Harlow v. Fitzgerald*, the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982). We review qualified immunity claims using a two-step analysis: (1) whether "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established . . . in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *But see Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

Regarding the alleged constitutional violation in the present case, "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner*, 471 U.S. at 7. The reasonableness of the officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In *Garner*, the Supreme Court held that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable" unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."

471 U.S. at 11.  The Supreme Court elaborated that "if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12.

We have previously provided the following factors to consider when applying the probable cause standard from *Garner*: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007).  And "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified." *Id.* at 896.  But we have also recognized "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mullins v. Cyranek*, 805 F.3d 760, 766–67 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396–97).

The first factor from *Bouggess* weighs in favor of Plaintiff since the severity of the crime at issue was minimal.  When they initially arrived at the apartment complex, the officers were responding to a noise complaint, which is a minor misdemeanor punishable by a fine, regarding the music coming from McShann's vehicle.  Once the officers looked into McShann's vehicle, they learned that McShann was in possession of a firearm.  This observation did not create probable cause that McShann had committed a firearm offense because Ohio law allows an individual to transport a loaded handgun in a motor vehicle if the possessor has a valid concealed handgun license.  Ohio Rev. Code § 2923.16(F)(5)(a).  Having no information on McShann, at that point the officers had no reason to believe that McShann possessed the weapon without a license or that McShann had been previously convicted of a felony, which would have prohibited him from possessing a firearm. *See Northup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015) ("Where it is lawful to possess a firearm, unlawful possession 'is not the default status.'" (quoting *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013))).  Defendants argue in their brief that they had "probable cause or reasonable suspicion to believe Mr. McShann was violating R.C. 2923.15, which prohibits a person from carrying a firearm while intoxicated."

(Appellees Br. at 27.)  But this argument is foreclosed by the officers' own admission that they did not suspect McShann to be intoxicated at the time they found him inside the vehicle.

As for the second factor, as discussed above, there is at least a genuine dispute of material fact as to whether McShann posed an immediate threat to the safety of the officers and whether he was resisting arrest.  Generally, drawing a weapon and pointing it at the officers can justify the use of deadly force.  *See Garner*, 471 U.S. at 11.  But while Officers Knight and Cornely testified that they saw McShann point a gun in the direction of the driver's side window, where Officers Knight and O'Neal were standing, Officer Howard testified that he only saw McShann grab the gun and did not see him point the gun at the officers.  Additionally, the Bauer report concluded that McShann was not holding a gun when he was shot in the hand based on the lack of damage to the firearm.  Given the factual dispute as to whether McShann held or pointed a gun at the officers, a reasonable jury could find that McShann did not pose an immediate threat of safety to the officers, such that a reasonable officer would not believe that McShann presented a serious risk of physical harm.  *See King*, 694 F.3d at 662 (finding that a "factual dispute exist[ed]" as to "whether Taylor reasonably believed that King posed a threat of serious physical harm to Taylor or the other officers" based on evidence and testimony that called into question whether "King pointed a gun at the officers just before being shot").

The third factor weighs in favor of Plaintiff because McShann was not resisting arrest at the time that he was shot; he was sitting in the car, just having awoken, and none of the officers claimed that McShann pulled the trigger of the firearm.  *Cf. Mullins*, 805 F.3d at 767 ("Mullins had his finger on the trigger of a gun, and at that time, he posed a serious threat to Cyranek and the general public . . . .").  Additionally, even assuming McShann was trying to resist arrest, the officers failed to provide any warning to McShann that the officers intended to shoot.  *See Garner*, 471 U.S. at 11–12.  A warning was feasible in this instance because the officers initiated the contact with McShann by banging on his car window and waking him up, and they had already been shouting commands, with which McShann had complied by raising his hands in the air.  Based on these factors, Officers Knight and Howard likely did not have probable cause under *Garner* to use deadly force against McShann—or there is at least a genuine dispute of

material fact as to this issue—because the officers did not have a reasonable belief that McShann posed a risk of serious physical harm to them.

Because there was a constitutional violation in this case, I would proceed to the question of whether McShann's right to be free from deadly force was clearly established. In determining whether a right is clearly established, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent." *Id.*; *see Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) ("[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs."). And "[w]e look first to the decisions of the Supreme Court, and then to the case law of this circuit in determining whether the right claimed was clearly established when the action complained of occurred." *Gragg v. Kty. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002).

For purposes of the present case, *Garner* clearly established that the use of deadly force without probable cause to believe that the individual posed a threat of serious physical harm is constitutionally unreasonable. 471 U.S. at 11. And in *King*, we stated that "[i]t has been clearly established in this circuit for some time that 'individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'" 694 F.3d at 664 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006)). In that case, we held that the district court erred in granting summary judgment based on qualified immunity because there was a genuine dispute of material fact as to whether the defendant pointed a gun at the officers before being shot. *Id.* at 662. We reasoned that if he had not pointed the gun at the officers, then his clearly established right to be free of deadly force would have been violated. *Id.* We also determined in *Bletz v. Gribble* that "if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper." 641 F.3d 743, 749 (6th Cir. 2011). Similarly, in the present case, assuming that McShann did not hold or point the gun at the officers, Howard and Knight violated McShann's clearly established right to be

free from deadly force—McShann not having posed a threat of physical harm to the officers based on the officers' reasonable belief.

For the foregoing reasons, I respectfully dissent and would reverse the district court's grant of summary judgment to Defendants and remand the case for further proceedings.