NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0188n.06

Case No. 22-5384

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 24, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEVEN STAUB, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| TRACY NIETZEL, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | O P I N I O N |
| | ) | |

Before: LARSEN, DAVIS, and MATHIS, Circuit Judges.

DAVIS, Circuit Judge. Steven Staub, a state prisoner serving time in the Kentucky Department of Corrections ("KDOC"), brought this civil rights action in federal court pursuant to 42 U.S.C. § 1983, alleging a violation of his constitutional right to due process. U.S. CONST. amend. XIV. He asserts claims against several employees of the KDOC who were involved in collecting evidence for and participating in disciplinary proceedings for Staub's alleged possession of contraband in his prison cell. Staub was found guilty of the violation and penalized with 90 days in administrative segregation and forfeiture of 180 days' good-time credit. Staub successfully appealed his misconduct conviction to the Kentucky Court of Appeals, which determined that the guilty finding was not supported by "some evidence" given the "suspect" chain-of-custody form prepared by defendant Tracy Nietzel.

After the disciplinary finding was expunged and his good-time credit restored, Staub brought this suit. Staub claims that Defendants violated his right to due process under the Fourteenth Amendment when they acted in concert to create and forge the chain-of-custody document used to find him guilty of possessing drugs in the prison disciplinary proceeding. Staub also asserts that Defendants Dawn Deckard, the adjustment officer who presided over his disciplinary hearing, and Clark Taylor, the warden who affirmed Deckard's guilty finding, violated his due process rights by convicting him based on insufficient evidence under the "some evidence" standard established by the Supreme Court in *Superintendent, Massachusetts Correctional Institution, Walpole v. Hill*, 472 U.S. 445, 454 (1985).

Staub sought summary judgment in district court, arguing that the Kentucky Court of Appeals' decision has preclusive effect, and thus, forecloses Defendants from relitigating the issue of whether they violated his due process rights. Defendants also pursued summary judgment, asserting that the state court decision was not entitled to preclusive effect on the federal proceedings and they were entitled to summary judgment on all claims.[1] The district court sided with Defendants, concluding, in pertinent part that: (1) the Kentucky Court of Appeals' decision did not preclude Defendants from defending this action; (2) Defendant Nietzel was entitled to summary judgment because even if the chain-of-custody was faulty, she did not cause any alleged deprivation of rights because she did not decide Staub's guilt and because false accusations of misconduct do not in and of themselves create a constitutional violation; (3) Defendant Taylor was

---

[1] Staub does not appeal the district court's decision on his state-law claims or his conspiracy claims, his claims against Defendants Faulkner, Beasley, Thompson, Wilson, and Brown and the dismissal of the incorrectly named defendant, Bart Nyer. His appeal is limited to the district court's decision on the preclusive effect of the Kentucky Court of Appeals decision, the dismissal of Defendant Deckard for failure to serve the summons and complaint, and the court's decision to grant summary judgment in favor of Defendants Taylor and Nietzel.

entitled to qualified immunity because he reasonably could have concluded under applicable Sixth Circuit caselaw that despite a faulty chain-of-custody form, there was still "some evidence" sufficient to support a guilty finding; and (4) Defendant Deckard was entitled to dismissal under Federal Rule of Civil Procedure 4(m) because Staub failed to effectuate service of the summons and complaint. We largely agree with the reasoning of the district court, and for the reasons that follow, we **AFFIRM**.

I.

On December 19, 2012, prison officials at Kentucky's Northpoint Training Center ("NTC"), where Staub was serving a state prison sentence, searched Staub's living quarters and found what appeared to be 11 Suboxone strips wrapped in cellophane. Marcus Faulkner, a training instructor at NTC, personally searched Staub and his locker, which Staub identified and unlocked for the search. Faulkner discovered several CD cases containing cellophane-wrapped Suboxone strips. The next day, Faulkner completed a disciplinary report describing the search. In the report, Faulkner noted that he found 11 Suboxone strips in Staub's locker, completed a chain-of-custody form, took photos of the Suboxone strips, and turned the strips over to Captain Jonathan Beasley to be placed in the evidence locker. After receiving the strips from Faulkner, Beasley completed an Extraordinary Occurrence Report ("EOR"), which included a photocopy of the chain-of-custody form. That form showed three separate entries from December 19, 2012: one entry documenting Faulkner's seizure of the suspected Suboxone strips from Staub's locker; one entry marking the transfer of those strips from Faulkner to Beasley; and one entry confirming Beasley's placement of the strips in the evidence locker. Beasley's chain-of-custody form did not include an Evidence Log number (that portion of the form was blank) and it indicated that the Suboxone strips had been obtained from "Bed 48," which apparently was not Staub's bed number.

Staub was charged in a prison disciplinary proceeding with "possession or promoting of dangerous contraband," to which he pleaded not guilty. The correctional facility held a disciplinary hearing on January 10, 2013. The chain-of-custody form submitted during the hearing was the version that Beasley had attached to his December 19, 2012 EOR; it showed Beasley as the last person to handle the seized Suboxone strips. At the hearing, Staub argued that there was no evidence that the strips seized had been tested by a lab. He also pointed out that the strips did not have any evidence tag number assigned to them. The presiding adjustment officer nonetheless found Staub guilty "based on the fact that . . . Faulkner found a total of 11 [S]uboxone strips in [inmate] Staub's locker" and penalized Staub with 90 days in disciplinary segregation and forfeiture of 180 days of good-time credit.

Staub appealed the adjustment officer's decision to NTC's warden, who ultimately ordered that Staub's case be reheard.[2] Because Staub had since been transferred, officials scheduled the second disciplinary hearing to take place at the Kentucky State Reformatory ("KSR"). Faulkner prepared a new disciplinary report, and Lt. Michael D. Wilson at KSR investigated the new report. Lt. Dawn Deckard, also at KSR, was assigned to serve as the presiding adjustment officer at Staub's second disciplinary hearing.

On February 28, 2013, Deckard received an email from Lt. Tracy Nietzel at NTC with information she had requested for the rehearing of Staub's case. Nietzel attached to the email an "MMC Buprenorphine HCL Test" worksheet dated December 19, 2012, which indicated that 33 strips[3] tested positive for "Buprenorphine HCL" – one of Suboxone's main ingredients. The

---

[2] The parties do not dispute this point, but in their motion for summary judgment, Defendants point out that there is no "extant documentation" of the warden's review of Staub's first disciplinary proceeding.

[3] As for the discrepancy between the number of strips tested by Nietzel (33) and the number found in Staub's living quarters (11), Nietzel apparently discovered during her field tests that each of the "strips" seized was actually a cellophane-wrapped packet of three strips.

worksheet, which was signed by Nietzel and a witness, listed Staub as the "Subject," Nietzel as the "Examiner," and "550" as the "Evid #." Nietzel also included two photographs of a testing vial as attachments to her email. On March 1, 2013, Wilson emailed Nietzel to ask if there was an updated chain-of-custody form for the Suboxone strips. Nietzel emailed Wilson a copy of the requested form ten days later.

Deckard presided over the second hearing on March 19, 2013 and found Staub guilty of possession or promoting of dangerous contraband. According to her report, Deckard based her decision on (1) the search of Staub on December 19, 2012; (2) the 11 Suboxone strips Faulkner found while searching Staub's property; (3) Beasley's statement that he placed those strips in the evidence locker; (4) evidence from Nietzel that there were actually 33 strips, that she tested the strips, and that the tests were positive for Buprenorphine; and (5) the fact that Nietzel identified the Suboxone through the pill identifier just as she would with a tablet or capsule. Deckard imposed a punishment of 90 days in disciplinary segregation, which Staub had already served by that point, and forfeiture of 180 days of good-time credit.

Staub appealed Deckard's decision to KSR's warden, Clark Taylor, challenging the sufficiency of the evidence supporting Deckard's finding of guilt. First, Staub highlighted inconsistencies between Nietzel's chain-of-custody form and the one reviewed during Staub's initial disciplinary hearing. *See Staub v. Taylor*, No. 2014–CA–001452–MR, 2015 WL 2445103, at *3 (Ky. Ct. App. May 22, 2015). He also challenged the fact that Deckard heard and decided his case despite her involvement in gathering evidence against him. *Id.* Taylor denied Staub's appeal on April 18, 2013, explaining that the Suboxone strips were found in his assigned locker; that a total of 33 strips had been seized; that these strips tested positive and were properly

identified; that Suboxone strips are very distinctive in shape and color; and that the foregoing was sufficient to affirm Deckard's finding of guilt.

After Taylor denied his appeal, Staub filed a petition for declaration of rights in Oldham Circuit Court. He named Taylor and Deckard as defendants in their respective capacities as warden and adjustment officer, asserting that the officials violated his due process rights during his second disciplinary hearing at KSR. The circuit court dismissed Staub's petition, and Staub appealed to the Kentucky Court of Appeals. The Kentucky Court of Appeals reversed the circuit court's dismissal, finding that Staub's due process rights were violated because the "disciplinary action decision" issued by Deckard and affirmed by Taylor "was not supported by at least 'some evidence' of record" as required under Supreme Court precedent. *Staub*, 2015 WL 2445103, at *1 (citing *Hill*, 472 U.S. at 454). More specifically, the Kentucky Court of Appeals found that Deckard and Taylor's decisions "were based almost entirely upon the results of Lt. Nietzel's field test on the suspected Suboxone strips" and "her identification" of those strips "through the pill identifier," evidence the court deemed questionable. *Id*. at *5. In the court of appeals' view, the "new version" of the chain-of-custody form that Nietzel emailed to Wilson in March 2013 was "highly suspect" because it included a "fourth entry [that] was not on" the version of the form that KSR officials had initially received as part of the record of Staub's first disciplinary hearing. *Id*. As such, the chain-of-custody document could not "form the basis for" admitting her field-test results as evidence against Staub. *Id*. Without the chain-of-custody document, "there [wa]s no evidence linking" the field-test results "to the strips found" in Staub's living quarters and "no other evidence in the record to support the imposition of any disciplinary action" against Staub, leading the Court of Appeals to conclude that "there [wa]s not 'some evidence' in the record to support the finding of guilt" against him. *Id*. at 5–6. After the Kentucky Court of Appeals issued its

decision, Staub's previously-forfeited good-time credit was restored, and the disciplinary actions stemming from the December 19, 2012 search at NTC were expunged from his prison record.

Staub subsequently filed the instant prisoner civil rights action in district court. He now appeals the district court's denial of his motion for summary judgment, the grant of Defendants' motion for summary judgment, and the dismissal of Defendant Deckard.

II.

This court reviews summary judgment orders *de novo*. *Kentucky v. Yellen*, 54 F.4th 325, 335 (6th Cir. 2022) (citing *Jordan v. Howard*, 987 F.3d 537, 542 (6th Cir. 2021)). Drawing all reasonable inferences in favor of the nonmovant, we examine whether the party seeking summary judgment demonstrated "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." *Id.* (quoting FED. R. CIV. P. 56(a)). On cross-motions for summary judgment, the court applies these same standards to each of the individual motions. *Id.* (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

III.

We find that the district court properly concluded that the state appellate court's resolution of Staub's challenge to his finding of misconduct did not preclude it from addressing his due process claim. As an initial matter, "[f]ederal courts apply the preclusion law of the State that rendered the initial judgment" – here, Kentucky. *Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1109 (6th Cir. 2022) (citing *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 490 (6th Cir. 2021)). The district court relied on *Kentucky Bar Ass'n v. Greene*, 386 S.W.3d 717, 724 (Ky. 2012) for its conclusion that issue preclusion under Kentucky law, "operate[s] as a bar to further litigation" only if the following five elements are met: (1) "the party to be bound in the second case must have been a party in the first case"; (2) "the issue in the second case must be the same

as the issue in the first case"; (3) "the issue must have been actually litigated"; (4) "the issue was actually decided in that action"; and (5) "the decision on the issue in the prior action must have been necessary to the court's judgment and adverse to the party to be bound." The *Greene* court explained that Kentucky's issue preclusion rule brings with it an expectation that a court in which the doctrine is later invoked will consider whether the party against whom it is asserted had a "realistically full and fair opportunity to present his case." 386 S.W.3d at 724.

Staub contends that the first element listed – that the party to be bound in the second action must have been a party in the first case – is not required under Kentucky law because Kentucky recognizes non-mutual collateral estoppel. *See Moore v. Commonwealth*, 954 S.W.2d 317 (Ky. 1997). He is partly right, but this does not help him. While it is true that the *Moore* court listed only four elements for collateral estoppel instead of five, it expressly held that non-mutual collateral estoppel is limited to circumstances where "at least the party to be bound is the same party in the prior action." *Id*. at 319; *see also Sedley v. City of W. Buechel*, 461 S.W.2d 556 (Ky. 1970) (explaining that a person who was not party to a prior action may assert *res judicata* "*against a party to that action*") (emphasis added). Thus, under Kentucky law, the party against whom preclusion is sought must still be the same party from the initial action.

Staub argues that even if this requirement generally applies, it is excused here because Defendants were adequately represented by prior affiliated parties – namely Taylor, the warden, and Deckard, the adjustment officer. Yet, two fundamental problems with Staub's argument emerge. First, the prior action was an official capacity suit only, which cannot operate to preclude defendants sued in their individual capacities in a subsequent suit. Second, the individual defendants did not have a full and fair opportunity to litigate their defenses in the first suit, which defeats Staub's preclusion argument. Each point is addressed in turn below.

A.      Staub's First Official Capacity Suit Does Not Have Preclusive Effect on the Second Suit Brought Against Defendants in Their Individual Capacities.

Based on Staub's own representation that he sued Taylor in his capacity as Warden, the district court determined that he sued Taylor in his official capacity in the prior action, and further concluded that the petition for declaration of rights was the functional equivalent of a suit against the KDOC.[4] We agree.  In *Smith v. O'Dea*, the Kentucky Court of Appeals explained that a petition for declaratory judgment pursuant to KY. REV. STAT. § 418.040 is a vehicle for inmates to seek review of their disputes with the Corrections Department.  939 S.W.2d 353, 355–56 (Ky. Ct. App. 1997) (citing *Polsgrove v. Ky. Bureau of Corrs.*, 559 S.W.2d 736 (1977); *Graham v. O'Dea*, 876 S.W.2d 621 (Ky. App. 1994)).  The *Smith* court observed that while such suits brought by inmates are technically original actions, they operate more like appeals.  First, they invoke the circuit court's authority to act as a court of review and additionally, the review is limited to the administrative record before it, reducing the need for any independent judicial factfinding.  And if further factfinding is necessary, the proper course is generally to remand to the agency for additional investigation or explanation.  *Smith*, 939 S.W.2d at 356.  Accordingly, we agree that Staub's first suit against Taylor was an official capacity suit only.  Importantly, a suit against Taylor in his official capacity is a suit against the KDOC itself.  *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) ("[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *see also Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity.").  The question thus becomes, whether

---

[4] The district court did not address whether Deckard was sued in her official capacity because she was dismissed from this action for failure to serve process on her. *See infra*.

the prior suit has preclusive effect in this case, when Taylor was named in his official capacity in that suit and Nietzel was not named in *any* capacity, but both are now sued in their individual capacities.

The Kentucky Supreme Court has not directly addressed the issue of whether an official capacity suit can operate to preclude a later-filed suit against defendants in their individual capacities. To predict how the Kentucky Supreme Court would resolve this issue, we must look to other "available data," including decisions of the state's lower appellate courts, restatements of law, and other federal court decisions interpreting state law. *See In re Darvocet*, 756 F.3d 917, 937 (6th Cir. 2014); *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999).

To begin, courts generally do not grant preclusive effect to an earlier judgment when a party against whom preclusion is sought is later sued in a different capacity. As we have previously held, "[a] party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity." *Mitchell v. Chapman*, 343 F.3d 811, 823 (6th Cir. 2003) (quoting Restatement (Second) of Judgments § 36(2) (1982)) (collecting cases); s*ee also True Gospel Church of God in Christ, Hopkinsville v. Church of God in Christ*, No. 2012-CA0000228-MR, 2013 WL 3388742, at *3 (Ky. Ct. App. July 5, 2013) ("[A] party appearing in a representative capacity in a former action is not barred by claim preclusion in a subsequent action if that party is proceeding individually or in a different representative capacity.") (citing Restatement (Second) of Judgments § 36(2) (Am. L. Inst. 1982)); 18A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4458 (3d ed. 2022) ("The relationships between a government and its officials justify preclusion only as to litigation undertaken in an official capacity. Thus a judgment against a government or one government official does not bind a different official in subsequent litigation

that asserts a personal liability against the official."). And as the district court observed, Kentucky courts have regularly turned to the Restatement of Judgments when analyzing issue preclusion. *See e.g., Appalachian Reg'l Healthcare, Inc. v. U.S. Nursing Corp.*, 824 F. App'x 360, 369–70 (6th Cir. 2020) (citing *Clark's Adm'x v. Rucker*, 258 S.W.2d 9, 9–11 (Ky. 1953) and *Buis v. Elliott*, 142 S.W.3d 137, 141 (Ky. 2004)); *see also Miller v. Admin. Off. of the Cts.*, 361 S.W.3d 867, 872-73 (Ky. 2011) (applying Restatement (Second) of Judgments, § 26). In sum, cases from this court, the Kentucky Court of Appeals, and the Restatement of Judgments are all in agreement that an official capacity suit cannot preclude a subsequent suit brought against officials in their individual capacities. The weight of the foregoing authority combined with the Kentucky Supreme Court's prior reliance on the Restatement of Judgments leads us to conclude that the Kentucky Supreme Court would most likely find that Staub's earlier official capacity suit has no preclusive effect in this matter as to any defendant sued in their individual capacity.

> B. <u>Defendants Did Not Have a Full and Fair Opportunity to Litigate Their Defenses in the First Action</u>.

Next, we conclude that Defendants here did not have a "full and fair opportunity" to litigate their defenses in the previous action – another critical consideration in determining when preclusion may apply. *See Greene*, 386 S.W.3d at 724 ("The rule contemplates that the court in which the doctrine is asserted will inquire into whether the judgment in the former action was in fact rendered under such conditions that the party against whom the doctrine is pleaded had a realistically full and fair opportunity to present his case."). As an initial matter, Defendants Nietzel, Beasley, Wilson, Thompson, and Brown were not named as parties in the earlier state court case. And Taylor and Deckard were only named in their official capacities, rendering them stand-ins for the KDOC. A governmental entity–effectively the only defendant in the first suit–

cannot assert personal immunities like qualified immunity. *Alkire*, 330 F.3d at 810–11. Thus, none of the defendants in the earlier case could assert the defense of qualified immunity. Further, because of the limited nature of the appellate review in the earlier Kentucky action, the parties in that case had no opportunity to conduct discovery. These facts weaken any argument that Defendants had a full and fair opportunity to litigate Staub's claims and their own defenses.

Furthermore, the Restatement (Second) of Judgments § 28 (Am. L. Inst. 1982) provides that an earlier suit does not preclude re-litigation where a "new determination . . . is warranted by differences in quality or extensiveness of the procedures followed in the two courts." *Id.* This exception applies where "the procedures available in the first court may have been tailored to the prompt, inexpensive determination of small claims and thus may be wholly inappropriate to the determination of the same issues when presented in the context of a much larger claim" or the "scope of review in the first action may have been very narrow." *Id.* cmt d. Moreover, the Kentucky Court of Appeals has concluded that where an earlier action involved relaxed rules of evidence, a system to quickly determine unemployment benefit status, and concerned minimal amounts of damages, unlike a regular civil action, § 28's exception applies. *Bd. of Educ. of Covington v. Gray*, 806 S.W.2d 400, 403 (Ky. Ct. App. 1991). Similarly, here, the first action was not an action for money damages, and the court's review was primarily limited to the administrative record. Accordingly, because none of the individual defendants in this case had the opportunity to raise and litigate the issue of qualified immunity in the first suit, and the first action was limited in several important respects, they cannot be barred from litigating their defenses here. For these reasons, we find that the Kentucky Court of Appeals' decision has no preclusive effect in this case.

IV.

Staub next argues that the district court erred when it ruled that his due process claim against Nietzel was barred as a matter of law. The district court concluded that even if Staub raised a genuine issue of material fact as to whether Nietzel forged the chain-of-custody form, "her mere creation of a forged document would not amount to a standalone procedural-due-process violation." The court identified two reasons for this conclusion. First, it concluded that regardless of the authenticity of the form, Nietzel was not involved in deciding Staub's guilt, and thus, could not have caused the unconstitutional deprivation of any liberty interest. Second, relying on *Jackson v. Hamlin*, 61 F. App'x 131, 132 (6th Cir. 2003) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)), the district court observed that there exists no constitutional right to be free from false accusations of misconduct. It concluded, more particularly, that the filing of a false disciplinary report or the filing of fabricated charges "do[es] not constitute a deprivation of constitutional rights where the charges are subsequently adjudicated in a fair hearing." *Cromer v. Dominguez*, 103 F. App'x 570, 573 (6th Cir. 2004). Applying these standards to Staub's circumstances, the court reasoned that since the facility afforded him a due process hearing, during which an adjustment officer independently assessed the authenticity and adequacy of the evidence against him, any alleged forgery by Nietzel does not give rise to a *per se* constitutional violation.

Staub contends, however, that it has been clearly established that "knowing fabrication of evidence violates constitutional rights." *Mills v. Barnard*, 869 F.3d 473, 486 (6th Cir. 2017); *see Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997). But, as Staub himself acknowledges, both *Mills* and *Stemler* dealt with "the knowing presentation of fabricated evidence in a state court *criminal* trial." Appellant's Br. at 38 (emphasis added). Administrative proceedings resolving misconduct charges, on the other hand, are not criminal prosecutions and

the Supreme Court has stated that "the full panoply of rights due a defendant in [a criminal prosecution] does not apply" to prison disciplinary proceedings. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). This is so because it is necessary to accommodate both "institutional needs and objectives and the provisions of the Constitution that are of general application." *Id*. To be clear, prisoners are not left without constitutional protection from fabricated evidence. Rather, the due process rights retained by prisoners in the context of such proceedings are tied directly to the procedural safeguards set up to determine the prisoner's guilt. *See id*. at 558. Staub has cited no case that makes a similar finding in the context of a misconduct hearing.

Relevant here, as it relates to any suspected fabrication of evidence introduced during the misconduct proceedings, Staub received the full panoply of procedural due process protections. Nietzel argues that the evidence of this fact is that (1) the adjustment officer (Deckard) independently assessed the authenticity and adequacy of the evidence against Staub, and (2) the warden (Taylor) also independently reviewed that evidence. This view finds support in the caselaw relied on by the district court. *See Jackson* and *Cromer*, *supra.* While the unpublished decisions in *Jackson* and *Cromer* carry no precedential weight, they are persuasive and consistent with cases from our sister circuits that address this issue in depth. For example, the Seventh Circuit starts with the premise that a government official's knowing use of false evidence in a criminal trial, like the cases on which *Staub* relies, is distinguishable from a prison official testifying falsely or planting false evidence in a misconduct proceeding. *Hanrahan v. Lane*, 747 F.2d 1137, 1140–41 (7th. Cir. 1984); *see also Mitchell v. Senkowski*, 158 F. App'x 346, 349 (2d Cir. 2005) ("The issuance of false misbehavior reports and provision of false testimony against an inmate by corrections officers is insufficient on its own to establish a denial of due process. Rather, such action violates due process only where either procedural protections were denied that would have

allowed the inmate to expose the falsity of the evidence against him, or where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights." (citations omitted)). For this reason, the *Hanrahan* court concluded that the protections against arbitrary actions by prison officials (e.g., fabrication of evidence), are the procedural due process requirements mandated by *Wolff*, 418 U.S. at 563-66. Before a prisoner may be punished, the prisoner must be afforded these protections, including advance written notice of the alleged violation; a written statement of fact-finding; and the right to present witnesses and evidence where it would not be unduly hazardous to institutional safety. *Hanrahan*, 747 F.2d at 1140. The court reasoned that "an impartial decisionmaking body protects the integrity of the procedure." *Id*. (citing *Redding v. Fairman*, 717 F.2d 1105 (7th Cir. 1983), *cert. denied*, 465 U.S. 1025 (1984)). And these procedural due process requirements protect prisoners from "arbitrary actions extinguishing their privileges." *Id.* (quoting *Redding*, 717 F.2d at 1116). This is so because the disciplinary procedures (1) allow a prisoner a chance to defend against improper or erroneous charges; (2) ensure fair, impartial decision-making on the part of prison officials before any imposition of sanctions against a prisoner; and (3) allow an inmate the opportunity to tell his own version of the events at issue to the disciplinary committee. *Id*.

Nothing in this record suggests that prison officials deprived Staub of these procedural protections. Staub's complaint about the process provided centers on the allegedly fabricated chain-of-custody form. He does not suggest that he was denied the opportunity to tell his side of the story or to otherwise defend himself. Under these circumstances, we find *Hanrahan's* reasoning persuasive. Prison officials provided Staub appropriate procedural due process measures as set forth in *Wolff*. This course of action offered the requisite protections against

arbitrary actions by prison officials– here, the allegedly fabricated chain-of-custody form. Because we affirm on this ground, we need not address the district court's causation analysis.

V.

Staub next contends that the district court incorrectly applied qualified immunity to his claim that Taylor violated his due process rights. He urges this court to conclude Taylor is not entitled to qualified immunity because the "some evidence" standard in *Hill* is long-established.[5] Defendants argue that the district court got it right by requiring a more specific clearly established right than the general violation of the "some evidence" standard set forth in *Hill*. We agree.

The defense of qualified immunity "protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). A plaintiff seeking to overcome qualified immunity must show that (1) "a constitutional violation has occurred" and (2) the "violation involved a clearly established constitutional right of which a reasonable person would have known." *Id.* (quoting *Sample v. Bailey*, 409 F.3d 689, 695-96 (6th Cir. 2005)).

The district court assumed without deciding that the Kentucky Court of Appeals was correct in concluding that Taylor violated the "some evidence" standard. The district court determined, however, that it was not "clearly established" that Taylor would violate this standard by relying, in part, on a questionable chain-of-custody form to find Staub guilty of possessing

---

[5] *Hill* requires that a prison disciplinary board's decision to find an inmate guilty of a charged offense to be supported by "some evidence." *Hill*, 472 U.S. at 455–56. This review does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. *Id.* Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the board. *Id.*

contraband. For instance, in *Higgs v. Bland*, where the plaintiff introduced evidence indicating lapses in the chain-of-custody, we held that "the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible 'property' or 'liberty' interest be so comprehensive as to preclude any possibility of error." 888 F.2d 443, 449 (6th Cir. 1989) (quoting *Mackey v. Montrym*, 443 U.S. 1, 13 (1979)). We also noted that due process "does not mandate that all governmental decision making comply with standards that assure perfect, error-free determinations." *Id.*; *see also Baker v. Kassulke*, 959 F.2d 233, at *1 (6th Cir. 1992) (unpublished) (asserting that state prisoners are "not constitutionally entitled to an 'air-tight' chain of custody" under the Due Process Clause). We had "little difficulty" finding that the positive drug test results, despite the lapses in the chain of custody, constituted "some evidence" to support the guilty finding. *Higgs*, 888 F.2d at 449; *see also Easton v. U.S. Corr. Corp.*, 45 F.3d 430 (6th Cir. 1994) (unpublished) (positive drug test was "some evidence" sufficient to support a guilty finding even where incident report showed that the sample was stored three hours before it was taken from the inmate); *Baker*, at *1 (positive urinalysis test constitutes "some evidence" to support guilty finding.).

When Staub administratively appealed Deckard's decision, Taylor upheld the guilty finding based on the search uncovering the Suboxone strips in the locker Staub identified as his own, the fact that the strips tested positive for Buprenorphine, and the fact that the strips were properly identified. A reasonable prison official in Taylor's position could have interpreted *Higgs* to mean that the record contained "some evidence" sufficient to affirm the guilty finding, despite the purportedly problematic chain-of-custody process. Accordingly, Taylor is entitled to qualified immunity and the district court properly granted summary judgment in his favor.

VI.

Staub also argues that the district court improperly dismissed Deckard from this lawsuit. We conclude, however, that the district court did not abuse its discretion in dismissing Deckard because Staub never served her with the summons and complaint. We review a district court's judgment dismissing a complaint for failure to effect timely service of process under the abuse-of-discretion standard. *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an[ ] erroneous legal standard." *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995) (citation omitted). We may reverse only if "firmly convinced that a mistake has been made, i.e., when we are left with a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Heavrin*, 330 F.3d 723, 727 (6th Cir. 2003) (citation omitted).

Once Staub filed his complaint, the district court ordered the Clerk of the Court to forward the complaint by certified mail to the Justice & Public Safety Cabinet, Office of Legal Counsel. The order further gave the Office of Legal Counsel 30 days to return the waiver of service for defendants. Unlike the other defendants, Deckard did not waive service. The district court's order directed the Clerk of the Court to prepare and issue the summons if a defendant declined to waive service and further directed the U.S. Marshals Service to serve a copy of the summons and complaint on that defendant. In the order directing service, the district court also warned Staub that if he received notice that a summons was returned to the court, then he "must take steps to remedy the defect in service by providing additional information to the Court" and that a failure to do so might result in dismissal of the unserved defendant. On July 20, 2016, several defendants returned the waiver of service, but Deckard was not among them. Nevertheless, the Department

of Corrections Office of Legal Services provided an address for Deckard. It does not appear from the district court docket that the clerk's office ever issued a summons for Deckard; nor did it provide the papers to the Marshal for service of the summons and complaint. Because the clerk of the court never issued a summons – and no summons was ever returned to the court unserved – the trigger for the court's order requiring Staub to provide additional information or face dismissal never occurred. Notwithstanding the administrative snafu, Staub was on notice that Deckard remained unserved by way of the return of waiver of service.

If a plaintiff does not serve the defendant within 90 days after filing the complaint, the district court must dismiss the action without prejudice or order that proper service be made. *Savoie v. City of E. Lansing, Mich.*, No. 21-2684, 2022 WL 3643339, at *2 (6th Cir. Aug. 24, 2022) (citing FED. R. CIV. P. 4(m)). If the plaintiff shows good cause for the deficient service, the district court must extend the time for service. *Id.* In its order on the parties' motions for summary judgment, the district court ordered Staub to show cause why Deckard should not be dismissed based on Staub's failure to serve her with the summons and complaint. In response, Staub pointed out that Deckard was aware of the lawsuit, having filed an affidavit in support of Defendants' motion for summary judgment. Staub also pointed out that the Marshals Service failed to effectuate service in accordance with the court's order. But the district court was unpersuaded and concluded that Staub had not shown good cause for the failure to timely serve the summons and complaint on Deckard. More specifically, the district court faulted Staub's failure – from 2016 to 2022 – to do anything about the lack of service on Deckard. It also concluded that the order directing the Marshals Service to serve the complaint did not excuse Staub's failure.

On appeal, Staub relies on *Byrd v. Stone* in support of his claim that he showed good cause. 94 F.3d 217 (6th. Cir. 1996). In *Byrd*, the district court had granted the plaintiff *in forma pauperis*

status, but the clerk's office failed to issue the summons as required by 28 U.S.C. § 1915(c)[6] and failed to appoint a U.S. Marshal to effectuate service as required by Federal Rule of Civil Procedure 4(c)(3).[7] *Id.* at 220. On plaintiff's inquiry, the Marshals Service informed him that it was taking care of service, but the clerk of the court never provided the papers for service. *Id.* at 218. On appeal from the district court's dismissal of *Byrd's* claims against the unserved defendants, we found the clerk's office and the Marshals Service "plainly derelict" in their duties to serve the summons and complaint, and concluded such failures constituted a showing of good cause under Rule 4. *Id.* at 220.

Rather than *Byrd*, the district court here relied on *VanDiver v. Martin*, 304 F. Supp. 2d 934, 943 (E.D. Mich. 2004). In *VanDiver*, a district court found that the plaintiff's failure to act, or notify, or request the Marshal to locate the unserved defendants "superseded" any neglect by the Marshal. *Id.* at 943. The court distinguished *Byrd* because, unlike the circumstances in that case, the clerk's office in *VanDiver* issued the summons and the Marshals Service mailed copies of the summons and complaint to the defendants, who later were found no longer to be employed by the Michigan Department of Corrections. *Id.* at 936. At this juncture, the court concluded that the plaintiff's failure to act superseded the Marshal's failure to do its job. *Id.* at 943. The key difference between *Byrd* and *VanDiver* was that the Marshals Service had attempted service in *VanDiver*, followed by the plaintiff's failure to take any action to ensure proper service despite notice, by return of unexecuted summonses, that the defendants had not been served. *Id.* at 937.

At first blush, Staub's circumstances seem more like *Byrd* than *VanDiver* because the specific trigger for Staub to provide additional information for service to the court did not occur.

---

[6] Now 28 U.S.C. § 1915(d).

[7] *Byrd* refers to Rule 4(c)(2) in error.

*See Reed-Bey v. Pramstaller*, 607 F. App'x 445, 450 (6th Cir. 2015) (affirming dismissal where waiver of service was returned unexecuted on four separate occasions and nothing suggested that the plaintiff made an effort to discover or provide additional information about the unserved defendants; in such circumstances, "an incarcerated plaintiff may not shirk all responsibility for seeing that the Marshals Service fulfils its duty to effectuate service."). But Staub did, nonetheless, receive notice that Deckard remained unserved via the return of the waiver of service for the other defendants sans any such return for Deckard. This fact, combined with Staub's failure to act for six years, distinguishes Staub's circumstances from those in *Byrd*. More specifically, in *Byrd*, only two years passed between the plaintiff's filing of his initial complaint and the defendant's motion to dismiss based on failure to effectuate service of process. *Id*. at 218-219. What occurred during those two years also distinguishes *Byrd*. Initially, the plaintiff proceeded *pro se* and then the court appointed counsel. *Id.* at 218. Counsel filed a first amended complaint, which was also not served, but then served the second amended complaint. *Id*. at 218-19. Two months later, the defendant moved to dismiss the complaint because the plaintiff did not effectuate service of the original complaint within the 120-day period set forth in Rule 4. *Id*. at 219. And notably, when he was *pro se*, Byrd *did* follow up with the Marshals Service on one occasion to make sure they were effectuating service; and the Marshals assured him they were doing so. *Id*. at 218. Thus, the plaintiff in *Byrd* undertook appreciably more efforts than Staub and much less time passed. These factual differences, along with the passage of six years from the date of the order of service to the order to show cause, lead us to a different conclusion on good cause than *Byrd*. In the particular circumstances of this case – the passage of six years along with Staub's failure to inquire about service after Deckard declined to waive service, when combined with Staub's failure to provide

any reasonable explanation for sitting idly by for six years – supports the district court's finding of a lack of good cause.

This does not end the inquiry. Once the district court determines that the plaintiff has not shown good cause, it must balance a number of factors when deciding whether to grant a discretionary extension of time:

> (1) whether an extension of time would be well beyond the timely service of process; (2) whether an extension of time would prejudice the defendant other than the inherent prejudice in having to defend the suit; (3) whether the defendant had actual notice of the lawsuit; (4) whether the court's refusal to extend time for service substantially prejudices the plaintiff, *i.e.*, would the plaintiff's lawsuit be time-barred; (5) whether the plaintiff had made any good faith efforts to effect proper service of process or was diligent in correcting any deficiencies; (6) whether the plaintiff is a pro se litigant deserving of additional latitude to correct defects in service of process; and (7) whether any equitable factors exist that might be relevant to the unique circumstances of the case.

*United States v. Oakland Physicians Med. Ctr.*, 44 F.4th 565, 569 (6th Cir. 2022).[8]

The district court correctly concluded that Staub had failed to fully brief and develop any argument to support a discretionary extension of time for service of process. Staub offered little analysis of these factors for the court's consideration, save for pointing out that Deckard had notice of the suit since she submitted an affidavit. Staub offers a similarly limited analysis on appeal. His arguments remain primarily focused on whether he established good cause. He has thus forfeited any further argument in this regard. *Rop v. Fed. Hous. Fin. Agency*, 50 F.4th 562, 584 n.8 (6th Cir. 2022) (explaining that the government forfeited argument by failing to raise it in the district court and again failed to develop the argument at any length on appeal) (citing *Guyan Int'l,*

---

[8] The district court referred to an earlier version of these factors (which did not include factors 6 and 7 identified above), as articulated in *Warrior Imports, Inc. v. 2 Crave*, 317 F.R.D. 66, 70 (N.D. Ohio 2016). Notably, *United States v. Oakland Physicians Med. Ctr.* was issued *after* the district court's decision regarding the dismissal of Deckard for failure to serve process.

*Inc. v. Pro. Benefits Adm'rs, Inc.*, 689 F.3d 793, 799 (6th Cir. 2012)).  Based on the foregoing, we

find that the district court did not abuse its discretion when it dismissed Deckard for lack of service.

VII.

For these reasons, we AFFIRM the judgment of the district court.